United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 9, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 02-10500

_____

OSCAR D. WILLIAMS, JR; ET AL,

Plaintiffs,

THOMAS GENE BROWN, CECIL JACKSON; L.B. BRUMLEY

Plaintiffs-Appellants-Cross-Appellees,

versus

KAUFMAN COUNTY; ROBERT HARRIS, Kaufman County Sheriff,

Defendants-Appellees-Cross-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Texas

_____

Before WIENER and BARKSDALE, Circuit Judges, and FURGESON, District

Judge.[*]

WIENER, Circuit Judge:[**]

Plaintiff-Appellants Thomas Gene Brown, Cecil Jackson and L.B.

Brumley (collectively "plaintiffs") appeal the district court's

denial of their unlawful detention, invasion of privacy, and oral

harassment claims in their § 1983 suit against Sheriff Robert

_____

[*] United States District Judge for the Western District of
Texas, sitting by designation.

[**] This opinion replaces the August 19, 2003 opinion in this
case, 343 F.3d 689 (5th Cir. 2003), which is hereby withdrawn.

Harris ("Harris") and Kaufman County, Texas ("the County"), (collectively, "defendants"). Defendants cross-appeal the district court's judgment in favor of plaintiffs on their claims for illegal strip search, municipal liability against the county, nominal and punitive damages against Harris in his personal capacity, and state constitutional declarative relief. For the following reasons, we affirm.

## I. FACTS AND PROCEEDINGS

In April of 1995, Sheriff Harris obtained a search warrant, based on information he received from a confidential informant, for a night club called the "Classic Club" in Terrell, Texas (the "Club"). The affidavit used to secure the warrant identified five individuals suspected of dealing crack cocaine, none of whom are the plaintiffs here, and included as suspects "all other person or persons whose names, identities, and descriptions are unknown to the affiant." The warrant itself, however, only authorized the police to "enter the suspected place described in [the affidavit] and to there search for the personal property described...and to seize same and to arrest and bring before [the magistrate] each suspected party named in [the affidavit]."

At about 9:45 p.m. the same day, Harris led a contingent of approximately forty (40) officers to the Club to execute the "hazardous" warrant.[1] Although some individuals were able to run

---

[1] According to the district court, the Kaufman County Sheriff's department considers the execution of a narcotics

2

away, and others outside the premises allegedly hurled bottles and rocks at the officers, the law enforcement personnel were able to secure the outer perimeter of the search area, which included the Club's building and parking lot, and the entire city block up to the roadway. On entering the Club, the officers noticed drugs on the floors and tables.

Plaintiffs Cecil Jackson and L.B. Brumley were inside the Club; plaintiff Thomas Gene Brown was outside, but when he repeatedly attempted to gain admittance, an officer arrested him and took him inside to be searched. The police detained approximately 100 people, including plaintiffs, inside the Club for about three hours. During that time, officers conducted a pat-down search, strip search, and warrants check on each individual there. Although strip searches were not part of any written policy concerning the execution of hazardous warrants, Harris testified that it was his standard policy to conduct a strip search on each person within the search area, with or without individualized probable cause. Also, pursuant to this "policy," the officers rehandcuffed plaintiffs (and all other detainees) and continued to detain them after the strip searches until the entire search of the

---

warrant a "hazardous entry," where weapons are likely to be present. Additionally, in a March 1994 search of the Club, police found drugs, drug paraphernalia, and a concealed .25 caliber pistol. After this search, Harris apparently received an anonymous telephone call threatening to kill him if he returned to the Club. Harris also testified that an officer had been shot at previously while attempting to execute a warrant at the Club.

Club and all occupants had been completed. Brumley got obstreperous after he was strip searched and was arrested for disorderly conduct.

Three years later, 17 individuals brought suit under § 1983, claiming that Harris and the County violated their Fourth Amendment rights by engaging in an illegal strip search, unlawful detention and oral harassment.[2] Four plaintiffs were dismissed, and 10 others settled their claims. The three remaining plaintiffs (plaintiffs-appellants herein) unsuccessfully attempted to amend their complaint, in part to include an invasion-of-privacy claim.

At the summary judgment stage, the district court granted summary judgment in favor of defendants on (1) the unlawful detention claims of those plaintiffs inside the Club when the premises were secured; (2) plaintiffs' invasion of privacy claims; and (3) plaintiffs' verbal harassment claims. The court denied defendants' summary judgment motion on (1) plaintiffs' illegal strip search claim; (2) the unlawful detention claims of plaintiffs who were not originally in the Club, but were brought in only after the premises were secured; and (3) plaintiffs' policy claims against Kaufman County.

After conducting a bench trial, the district court concluded that (1) Harris had conducted an unconstitutional strip search of

---

[2]Plaintiff brought a variety of other claims, such as excessive force, civil conspiracy, assault and battery, and intentional infliction of emotional distress, but all were rejected on summary judgment and have not been appealed to us.

plaintiffs, and he is not entitled to qualified immunity because the rule of law prohibiting these searches was clearly established at the time, making Harris's conduct objectively unreasonable; (2) Harris is entitled to qualified immunity on Brown's illegal detention claim, the only detention claim surviving summary judgment;[3] and (3) Kaufman County is liable for Harris's conduct because Harris is a policymaker whose actions (specifically, his orally established policy of conducting strip searches irrespective of the absence of reasonable suspicion) had been the moving force behind the violation of plaintiffs' constitutional rights.

Based on these rulings, the court awarded each plaintiff "nominal damages" of $100, and punitive damages of $15,000 against Harris in his individual capacity. The court also awarded plaintiffs declaratory relief, decreeing that Harris and the County had violated plaintiffs' rights under Article I, section 9 of the Texas Constitution. The court rejected plaintiffs' claim for

---

[3]The district court dismissed the unlawful detention claims of all of the Group 1 plaintiffs, who consisted of those inside the Club when the premises were secured by police, but allowed to go to trial the detention claims of the Group 2 plaintiffs, who consisted of those outside of the Club when the premises were secured. Plaintiff Thomas Gene Brown was outside the Club when the premises were secured, and therefore should have been named in Group 2. When the court described the different groups of plaintiffs, however, it placed Brown in Group 1. As the court subsequently addressed Brown's unlawful detention claim at trial, the implied inclusion of his name in Group 1 at the summary judgment stage appears to have been an inadvertent and harmless mistake.

5

injunctive relief.[4]  Both plaintiffs and defendants timely filed notices of appeal.

## II. ANALYSIS

A.   **Standard of Review**

We review the district court's summary judgment decision <u>de novo</u>.[5]  Summary judgment is only proper if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.[6]  To determine whether there are any material factual issues, we consult the applicable substantive law to define which issues are material, and then consider the evidence relevant to those issues in the light most favorable to the non-moving party.[7]

We review the district court's bench trial conclusions of law <u>de novo</u>, and findings of fact for clear error.  Finally, we review the district court's decision to award punitive damages for abuse of discretion,[8] and examine the constitutionality of the amount of such an award <u>de novo</u>.[9]

---

[4] The court also directed the parties to attempt to resolve the attorneys' fees issues themselves.

[5] <u>Harper v. Harris County</u>, 21 F.3d 597, 600 (5th Cir. 1994).

[6] Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

[7] <u>Harper</u>, 21 F.3d at 600.

[8] <u>Sockwell v. Phelps</u>, 20 F.3d 187, 192 (5th Cir. 1994).

[9] <u>Cooper Indus., Inc. v. Leatherman Tool Group, Inc.</u>, 532 U.S. 424, 436 (2001).

B.   **Parties' Contentions**

Because the district court addressed plaintiffs' claims at both the summary judgment and trial stages of the litigation, and because the parties appeal different aspects of the judgments rendered, we briefly summarize the parties' contentions on appeal in the interest of clarity.

Plaintiffs make four claims (1) Harris supervised an unlawful detention, which was objectively unreasonable, pretermitting qualified immunity; (2) Harris's search method amounted to an invasion of plaintiffs' privacy; (3) the officers' use of racial epithets violated plaintiffs' Fourth Amendment rights; and (4) the County is liable for the constitutional violations caused by Harris's conduct.  In short, plaintiffs contest essentially all of the district court's summary judgment holdings adverse to them.

For their part, defendants argue that (1) within the context of executing a hazardous search warrant, it was proper for the officers under Harris's command to conduct strip searches; but even if plaintiffs' rights were violated, Harris deserves qualified immunity; (2) Harris acted reasonably in detaining plaintiffs until the completion of the entire search of the Club; but even if Harris acted unlawfully, he is entitled to qualified immunity; (3) the district court properly dismissed plaintiffs' claims of invasion of privacy for their failure to plead such claims; (4) the district court properly denied plaintiffs' claims of oral harassment because

7

plaintiffs failed to plead an equal protection claim under the Fourteenth Amendment; (5) the district court erred in assessing nominal (insisting that $100 per plaintiff is not nominal) and punitive damages; (6) the district court erred in finding that defendants violated the Texas Constitution; and (7) the County is not liable for conduct that does not amount to a constitutional violation.

C. **Qualified Immunity Standard**

To prevail in a § 1983 suit, a plaintiff must overcome an officer's defense of qualified immunity. Last term, in Hope v. Pelzer, the Supreme Court rendered its most recent articulation of this standard,[10] which we subsequently adopted.[11] To determine whether relief is appropriate, the court must undertake a two-step analysis.[12] First, the court must evaluate whether a "plaintiff's allegations, if true, establish a constitutional violation."[13] We

---

[10] 536 U.S. 730 (2002).

[11] Roe v. Texas Dep't of Protective and Regulatory Serv., 299 F.3d 395, 408-09 (5th Cir. 2002).

[12] The district court outlined a three step inquiry, examining (1) whether a constitutional right was violated, (2) whether that right was clearly established, and (3) whether the officers engaged in objectively unreasonable conduct. The district court, however, unnecessarily decoupled the clearly established/objective unreasonableness test of the Supreme Court. That is, if a right is clearly established enough to impart fair warning to officers, then their conduct in violating that right cannot be objectively reasonable.

[13] Hope, 536 U.S. at 736 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001).

address this inquiry in greater detail in connection with each of the contested constitutional claims.

Second, if a constitutional violation is found to have occurred, the court must determine whether the defendant's actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known."[14] The Hope Court reiterated the standard for a constitutional right to be clearly established:

> [I]ts contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful....but it is to say that in the light of pre-existing law the unlawfulness must be apparent."[15]

In Hope, the Court clarified that the factual situation from which the pre-existing constitutional right developed does not have to be "fundamentally similar" to the one before a court when addressing qualified immunity.[16] Rather, qualified immunity can be overcome as long as "'prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'"[17] The Court

---

[14] Id. at 739 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

[15] Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

[16] Id. at 740 (relying on its reasoning and holding in United States v. Lanier, 520 U.S. 259 (1997)).

[17] Id. (quoting Lanier, 520 U.S. at 269). According to the Hope court, Lanier explained "that the 'fair warning' requirement is identical under § 242 and the qualified immunity standard."

9

concluded that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."[18]

The appropriate inquiry, therefore, is "whether the state of the law [at the time of the violation] gave [defendants] fair warning that their alleged treatment of [plaintiffs] was unconstitutional."[19]

D.   **Unlawful Strip Search**

1.   Whether Harris's conduct violated the Fourth Amendment

On appeal, defendants argue that, within the context of executing a hazardous search warrant, it was proper for Harris to conduct strip searches of plaintiffs.  In Ybarra v. Illinois, the Supreme Court addressed the search of a bar patron, which occurred during the execution of a search warrant that authorized police to search the Aurora Tavern and a bartender named "Greg" for heroin and other contraband.[20]  The Court accepted that police had a valid warrant to search the premises, but concluded that "it gave them no

---

Hope, 536 U.S. at 740.

[18] Id. at 741.

[19] Id.  The Hope Court addressed Alabama's practice of handcuffing inmates to a "hitching post" as a disciplinary remedy.  The Court concluded that prior precedent, an Alabama regulation and a DOJ warning all sufficed to give prison officials fair warning that their hitching post practice violated the Eighth Amendment.  Id. at 741-46.  In particular, the precedent it relied on already prohibited (1) handcuffing inmates to fences for long periods of time, and (2) physical punishment that occurred after a prisoner had terminated his resistance to authority.  Id. at 742-43.

[20] 444 U.S. 85, 88 (1979).

10

authority whatever to invade the constitutional protections possessed individually by the tavern's customers."[21]   Reasoning further, the Court stated:

> "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person....Where the standard is probable cause, a search or seizure of a person must be supported by <u>probable cause particularized with respect to that person</u>. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.[22]

The Court also concluded that even the initial frisk of the patron, Ybarra, much less his subsequent search, was unjustified.[23] Although <u>Terry v. Ohio</u> created an exception to the probable cause requirement, allowing police officers to protect themselves by conducting a patdown of a suspect, the <u>Ybarra</u> court held that "[t]he 'narrow scope' of the <u>Terry</u> exception does not permit a frisk for weapons on less than reasonable belief or suspicion <u>directed at the person to be frisked</u>, even though that person happens to be on premises where an authorized narcotics search is taking place."[24]

Here, the district court concluded, relying primarily on <u>Ybarra</u>, that Harris's strip search of plaintiffs violated their

---

[21] <u>Id.</u> at 92.

[22] <u>Id.</u> at 91 (emphasis added).

[23] <u>Id.</u> at 92-93.

[24] <u>Id.</u> at 94 (emphasis added).

11

Fourth Amendment rights.  On appeal, Harris and the County contend that the violent history of the Club created exigent circumstances, which threatened officer safety and thus justified the strip search of the plaintiffs.  In contrast to Ybarra, they argue, the exigent circumstances in this case presented a situation in which there was "more" than plaintiffs' "mere propinquity to others independently suspected of criminal activity."

Although the discrete facts of this case differ from Ybarra, those differences are not sufficient to create a meaningful distinction.  Ybarra squarely held that in premises searches like this one, police must have either articulable reasonable suspicion to frisk an individual or probable cause to search him.  The record evidence, in particular Harris's own testimony, reflects that, vis-à-vis the plaintiffs, the police lacked even reasonable suspicion. None of the plaintiffs was named in the warrant, and Harris offered no reasonable belief that the plaintiffs in particular were armed or engaged in criminal activity.  Even if, based solely on the Club's history, it had been reasonable for Harris to suspect that plaintiffs were armed or carrying drugs, searching them would still have been unlawful:  Ybarra reiterated that the Terry-style search is limited to a frisk for weapons.[25]  Harris's officers frisked the

_____

[25] As Ybarra held, "[n]othing in Terry can be understood to allow...any search whatever for anything but weapons."  444 U.S. at 93-94.  The Court also stated that "a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted."  Id. at 93.

12

plaintiffs, but found no evidence of weapons, drugs or contraband to ripen into the probable cause required for a full-blown search. Harris testified that the officers conducting the search had no individualized probable cause as to any of the plaintiffs. Instead, he stated only that there was "probable cause to believe that everyone in there may have had drugs on them." Finally, as the district court reasonably explained, the intrusiveness of the search outweighed the legitimate law enforcement interests in protection and safety, because the officers had already handcuffed and patted down the plaintiffs before forcing them to undergo strip searches.[26]

Neither of the other two potential justifications for the strip search — arrest or identity in a warrant — mitigate the unlawfulness of the search. First, although two of the plaintiffs, Brumley and Brown, were arrested that evening, neither of the arrests justified strip searches under the applicable law. Brumley was arrested for disorderly conduct after he was strip searched; thus his post hoc arrest could not have justified the search. Brown was arrested before the search, but for attempting to enter

---

[26] The district court also found that Bell v. Wolfish, 441 U.S. 520 (1979) justifies strip searches on the reasonable suspicion that an individual is concealing weapons or contraband. Bell, however, dealt with pre-trial detainees who were awaiting trial on serious federal charges. Stewart v. Lubbock County, 767 F.2d 153, 156 (5th Cir. 1985) (explaining Bell's holding). Thus, the intrusiveness/law enforcement interests balance was more heavily in favor of law enforcement than the one conducted here, in which the police lacked both articulable reasonable suspicion and probable cause of wrong-doing to conduct any type of search.

13

the Club (claiming he owned it) in spite of an officer's order to leave the area.

We have allowed strip searches in custodial situations but, consistently, not when the suspect has committed only a minor offense and there exists no reasonable suspicion that he might possess weapons or contraband.[27] Although Brown was attempting to enter a Club in which drugs were found, defendants offer no evidence for suspecting that he possessed weapons or contraband. Indeed, Harris admitted that he had no probable cause toward Brown; the arresting officer testified that he had no suspicion that Brown was carrying weapons; and prior to the strip search the officers took everything out of Brown's pockets, revealing no weapons or drugs, and thereby dispelling any suspicion of illegal activity. As a result, the subsequent strip search, after reasonable suspicion had failed to mature into probable cause, was unreasonably intrusive.

Second, the affidavit that Harris filed to obtain the warrant was insufficient to justify a strip search of plaintiffs. The affidavit submitted for the warrant included as suspects "all other person or persons whose names, identities, and descriptions are unknown to the affiant." The warrant itself only authorized the police to "enter the suspected place described in [the affidavit] and to there search for the personal property described...and to

---

[27] Watt v. Richardson Police Dep't, 849 F.2d 195, 199 (5th Cir. 1988) Stewart, 767 F.2d at 156-57.

14

seize same and to arrest and bring before [the magistrate] <u>each suspected party named</u> in [the affidavit]" (emphasis added). None of the plaintiffs was named as a suspect in the affidavit. Furthermore, as <u>Ybarra</u> confirmed, because the Fourth Amendment requires particularity, "'open-ended' or 'general' warrants are constitutionally prohibited."[28] To construe this warrant as authorizing a general search of any person found in the Club would sanction exactly the type of general warrant that the Constitution forbids.

In sum, the strip search of the plaintiffs was unlawful because Harris lacked probable cause toward each of them.

2.  <u>Whether the law was "clearly established"</u>

The district court concluded that "no reasonable officer could have believed that conducting a strip search in these circumstances, without probable cause or reasonable suspicion, was objectively reasonable." The court noted that both <u>Ybarra</u> and <u>Watt v. Richardson Police Department</u>[29] clearly established that strip searches conducted without individualized reasonable suspicion or probable cause are unlawful. On appeal, Harris contends that reasonable officers could have disagreed about the legality of the strip search because of the hazardous conditions surrounding the

---

[28] 444 U.S. at 92, n.4.

[29] 849 F.2d 195 (5th Cir. 1988).

15

execution of the search warrant.[30]

Hope instructs that once it is clear that a constitutional violation has occurred, courts must examine whether the state of the law at the time gave the defendants fair warning that their behavior toward the plaintiffs was unlawful. In this case, we agree with the district court that Ybarra and our case law on strip searches provided fair warning to Harris that his conduct was unlawful. Ybarra addressed a situation substantially similar to the one here, and explicitly held that officers must have reasonable suspicion to conduct a frisk or individualized probable cause to conduct a lawful search. Even accepting that there were aspects of this warrant's search that made it more hazardous than the one conducted in Ybarra, or made it more likely that multiple persons would be in possession of drugs, none of these extenuating circumstances created probable cause or reasonable suspicion "particularized with respect to [plaintiffs]."[31] And even if hazardous circumstances had given rise to reasonable suspicion that plaintiffs, by being present, might have possessed weapons or contraband, Harris should have known that his officers were limited to a patdown of each plaintiff. Thus, to the extent this case differs factually from Ybarra, it still fits comfortably under the general rule promulgated by the Supreme Court in that case.

---

[30] Kaufman only argues on appeal that the strip search was constitutional, and does not raise the qualified immunity issue.

[31] Ybarra, 444 U.S. at 91.

16

Indeed, Harris's declaration that "we did have probable cause to believe that everyone in [the Club] may have had drugs on them" demonstrates his unjustified disregard or deliberate ignorance of the rule articulated by the Ybarra court.

In addition, our prohibition of strip searches in other contexts presented more than fair warning at the time that the strip searches at issue here were illegal. In Stewart v. Lubbock County, we employed the test articulated in Bell v. Wolfish, balancing law enforcement interests in the search against the level of invasion of personal rights caused by the search.[32] We concluded that the strip search policy at issue there violated the Fourth Amendment because it applied to minor offenders about whom the police had no reasonable suspicion of possessing weapons or contraband.[33] Similarly, in Watt v. Richardson Police Department, we recognized that even though strip searches of inmates were often allowed to maintain institutional security, when an arrestee's offense is minor, his criminal history innocuous or ancient, and his personal characteristics at odds with reasonable fears about prison security, the strip search is illegal.[34]

Unlike both Stewart and Watt, this case concerns individuals outside the prison context, thus individuals toward whom the police

---

[32] 767 F.2d at 156 (citing Bell v. Wolfish, 441 U.S. 520, 559 (1979)).

[33] Id. at 156-57 (emphasis added).

[34] 849 F.2d at 197, 199.

had even less individualized reasonable suspicion or probable cause — none, to be precise. Thus, if any law enforcement interest existed at all, it concerned only officer safety, not prison security. After handcuffing and patting down the plaintiffs here, however, even this law enforcement interest ceased to exist. On appeal, Harris and the County repeatedly encant the hazardous conditions of the search, yet Harris admits that he had no individualized probable cause that any of the plaintiffs had weapons, drugs or contraband. Furthermore, even though Brown was arrested before he was strip searched, he was arrested because he interfered with the duties of a public servant, not because of any probable cause or reasonable suspicion related to drugs or weapons. To the extent the police were legitimately worried about their safety in regard to Brown or any other individuals before or during the searches, those concerns surely evanesced once the officers handcuffed and patted down the plaintiffs. At that point, the law enforcement interests were substantially less significant than those in either Stewart or Watt. Finally, weighed against this interest, the invasion of personal rights caused by the strip searches here are at least if not more intrusive than in either Stewart or Watt.[35] In short, Stewart and Watt also provided fair

---

[35]In both of those cases, there was no allegation that the privacy of the suspect was compromised. Here, however, plaintiffs alleged that they were not afforded the requisite privacy, and the district court found that the searches were conducted "in an atmosphere of questionable privacy."

warning to Harris that law enforcement interests in safety did not justify the extreme intrusiveness of strip searches especially once the plaintiffs were handcuffed and patted down.

In sum, Ybarra, Stewart and Watt dispel any doubt that the law was clearly established by the night of the raid in April, 1995, that strip searching individuals, about whom the police had no individualized probable cause of weapon or drug possession, was unlawful. This in turn precludes Harris's entitlement to qualified immunity.

E.   **Unlawful Detention**

1.   Whether Harris's conduct violated the Fourth Amendment

The district court rejected Brumley's and Jackson's unlawful detention claims at summary judgment and rejected Brown's claim after the bench trial, all on qualified immunity grounds. The court concluded that despite its reservations about the length of detention, under Michigan v. Summers it was not objectively unreasonable for the officers to detain all those present in the Club, including plaintiffs, until completion of the search. Although Brown was not on the premises when the search began, the court nonetheless also concluded that his detention was not objectively unreasonable, inasmuch as Brown had voluntarily come within the search perimeter by insisting on entering the Club, despite warnings to leave the area.

On appeal, plaintiffs claim that the court erred in granting

19

summary judgment against Brumley and Jackson, and judgment against Brown, on their detention claims. Plaintiffs contend that there was no justifiable reason to detain plaintiffs after they were strip searched and cleared of outstanding warrants. Their continued, re-handcuffed detention, they argue, was not the least intrusive method available to the police, and thus constituted unlawful detention.[36]

In Michigan v. Summers, the Supreme Court reiterated the approach by which a seizure must be analyzed.[37] There is a "general rule that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause."[38] This rule is tempered, however, by the "ultimate standard of reasonableness embodied in the Fourth Amendment."[39] Thus, some seizures, even though longer than momentary, "constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for

---

[36] Plaintiffs also assert that they were detained for three hours after completion of the strip search. This assertion is contradicted by the district court's factual finding and record testimony that they entire search of the Club lasted only about three hours.

[37] 452 U.S. 692, 699-701 (1981).

[38] Id. at 700.

[39] Id. at 699-700.

suspecting criminal activity."[40]  Such intrusions are "not confined to the momentary, on-the-street detention accompanied by a frisk for weapons," as was involved in Terry v. Ohio.[41]

For determining whether a seizure falls into this  exception to the general rule, the Court set out a familiar balancing test, which weighed the character of the intrusion against the character of the justification.[42]  In Summers, the Court addressed whether police who were about to execute a warrant to search a house acted permissibly when they detained an individual who was emerging from the house and who turned out to be the owner, while they conducted the search.  The Court found the intrusion substantially less invasive than an arrest because (1) the police conducted the search pursuant to a valid warrant, which already authorized a substantial, and arguably more intrusive, invasion of privacy of the detainee's home; (2) the officers were unlikely to prolong the detention to gain more information because they were primarily seeking information from the search itself; and (3) the detention was inside the detainee's home instead of the police station, thereby minimizing the public stigma associated with the event.[43]

In comparison, the character of the justification is measured

_____

[40] Id. at 699.

[41] Id. at 700.

[42] Id. at 700-01.

[43] Id. at 701-02.

by both law enforcement interests and the nature of the articulable facts supporting the detention.[44]  The Court identified three law enforcement interests, all of which supported the detention at issue: (1) preventing the flight of the suspect; (2) minimizing the risk of harm to the police; and (3) facilitating the orderly completion of the search by having the occupant of the premises present.[45]  Furthermore, the existence of the valid search warrant, issued by a neutral magistrate to search a home for criminal activity, established probable cause that someone in the home was committing a crime, which in turn provided justification for detaining the home's occupant.[46]  The Court concluded:

> If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home.  Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.[47]

In Heitschmidt v. City of Houston, we limited Summers to its facts.  We concluded that Summers only holds that "police have limited authority to detain the occupant of a house without probable cause while the premises is searched, when the detention

---

[44] Id. at 702.

[45] Id. at 702-03.

[46] Id. at 703-04.

[47] Id. at 704-05.

22

is neither prolonged nor unduly intrusive, and when police are executing a validly executed search warrant for contraband."[48]

Heitschmidt involved a police search of a house in which the occupant, Heitschmidt, had little known connection at the time of the search to the criminal activity for which the search warrant was procured.[49] Although the police had a warrant to search the house, we reasoned that the intrusiveness of the detention was substantial because Heitschmidt was allegedly handcuffed on the street, pushed into the trunk of a car, and then detained for over four hours without a bathroom break.[50] In comparison, we found the justifications for detention unpersuasive, because there was little evidence Heitschmidt would flee, or that such restraint was required for police protection.[51] We reasoned further that a search warrant is a weaker basis for detention when police know the occupant's identity and have no reasonable basis for suspecting that that person is engaged in criminal activity.[52] Finally, in

---

[48] 161 F.3d 834, 838 (5th Cir. 1998).

[49] Id. at 838. Heitschmidt was living with Anne Fucaluro, who operated a prostitution ring. Fucaluro was arrested and police obtained a warrant to search the house, but Heitschmidt was not a target of the investigation, nor did police have suspicion before the search that he was involved in any wrong-doing. Id. at 835.

[50] Id. at 838.

[51] Id. In particular, we noted that there was no evidence that Heitschmidt was involved in the prostitution ring they were investigating, or that he would use a weapon. Id.

[52] Id. at 838-39.

23

contrast to <u>Summers</u>, we noted that the search warrant was for evidence of the other house occupant's prostitution ring, not specifically for contraband.[53]  On the basis of this analysis, we concluded that Heitschmidt had adequately alleged a violation of his Fourth Amendment rights, and that the right alleged was clearly established.  We therefore held the officers' conduct to be objectively unreasonable.[54]

In this case, Harris and the County argue that the detention was reasonable.  The County avers that the plaintiffs were allowed to move around and use the bathroom after their individual searches, and that the three hour detention was reasonable because there were 100 people on the premises.  Defendants also argue that the violent history of the Club, and Harris's fear that those released early would return with firearms to harm the officers, justified the lengthy detention.

There is no question that the seizure of plaintiffs had many of the essential attributes of an arrest.  We therefore must determine whether the law enforcement interests outweighed plaintiffs' interest against intrusion as articulated in <u>Summers</u> and <u>Heitschmidt</u>.  We begin by noting that some factual details of this case distinguish it from our narrow interpretation of <u>Summers</u>

_____

[53] <u>Id.</u>  The <u>Summers</u> Court had specifically stated that it did "not decide whether the same result [i.e. permissible detention] would be justified if the search warrant merely authorized a search for evidence."  452 U.S. at 705, n.20.

[54] <u>Heitschmidt</u>, 161 F.3d at 839.

24

(1) Plaintiffs were customers at a public commercial establishment, not occupants of a residence; and (2) plaintiffs were subjected to unlawful, unduly intrusive strip searches during the warrant-authorized search of the premises.[55]

Furthermore, when we apply the full Summers balancing test, we confirm that the extended detention of plaintiffs was indeed unlawful. The intrusiveness of the detention was much greater than in Summers. Although Harris had a valid warrant to search the Club, he went well beyond the limits of that warrant, conducting highly intrusive strip searches of plaintiffs, about whom he had neither individualized reasonable suspicion nor probable cause. After failing to uncover contraband or weapons on the person of plaintiffs, Harris nevertheless detained them and kept them handcuffed for the remainder of the three-hour search. Because this was a public establishment and not a private residence, moreover, plaintiffs had no reason to remain at the Club during the search.[56] The illegal strip searches of plaintiffs and all other

---

[55] Summers ultimately held that the authority to detain occupants of premises was only permissible "while a proper search is conducted." 452 U.S. at 705 (emphasis added). Although Harris had a valid warrant to search the premises, we have already concluded that the strip search of plaintiffs was both improper and illegal, and exceeded the scope of that warrant.

[56] Because Brown's nephew owned the Club, he apparently had an interest in finding out what was happening at the Club. But this interest did not necessarily include remaining at the Club while the search was conducted. He had not been at the Club that evening, and was brought inside after the police had begun the raid. Thus, his possible reasons for being there are not the same as the house owner in Summers or Heitschmidt.

occupants added to the prolongation of the detention and demonstrated Harris's intent to gain more information than he was authorized to retrieve. Last, the public stigma associated with the detention was greater than in either Summers or Heitschmidt, because the detention lasted three hours in a public venue, not in the obscurity of a residence.

On the opposite side of the scale are the law enforcement interests and articulable facts supporting plaintiffs' detention. The proffered law enforcement interests in preventing flight and maintaining safety here are questionable. Once the premises had been secured and the officers had strip-searched and warrant-checked the plaintiffs, uncovering no evidence to create probable cause, there was no need to prevent their flight and no identifiable fear that, if released, plaintiffs would return to inflict harm.

In addition, there are no articulable facts that provide valid support for the extended detention of plaintiffs. Although Harris had a warrant to search the Club, and on that basis, had general, non-specific probable cause that persons known or unknown might be committing crimes in the Club, the warrant only permitted the search of the premises and the five individuals named in the affidavit. Because the warrant named specific individuals and did not explicitly allow the more general search requested in Harris's affidavit, the judicially-prescribed justification for the extended detention of plaintiffs was far less substantial than in Summers.

26

Once the police had patted down, strip searched, and conducted a warrants check, moreover, the police surely had no articulable and individualized suspicion to justify further detention of the plaintiffs.

Neither Brumley's arrest for disorderly conduct during the period of the detention nor Brown's arrest for interfering with the duties of a public servant alters our conclusion that the extended detention was unlawful. Brumley's arrest for disorderly conduct occurred after the search and after a period, subsequent to the search, during which Brumley was handcuffed and forced to lie face-down on the ground outside the Club. We cannot conclude that his further detention was permissible on the basis of the arrest, because such a conclusion would effectively allow the police to create a potential threat to their safety through unconstitutional, provocative conduct, and then rely on that manufactured threat to perpetrate additional constitutional violations. Furthermore, although Brown had shown a willingness to ignore police orders, he had only sought admittance because of his family relationship to the Club's owner. Thus, his arrest had nothing to do with the search of the Club. He was not present at the Club when the raid began, and the officer who arrested him testified that he had no probable cause to believe that Brown was carrying a weapon. In fact, his "arrest" lasted only for the duration of the search and he was never booked or incarcerated.

Harris and the County nevertheless persist in urging that the

27

detention of plaintiffs was necessary for an orderly completion of the search of the Club, and was reasonable both because of the number of persons present at the Club and because of Harris's fear that those released would return armed. We are aware of the circumstances that the police believed they were actually facing when they executed their search warrant. The history of violence and drug use certainly gave Harris reason to worry about the safety of his officers. The nature of the search and the number of persons present also made the search of the Club factually distinct from the average search of small groups or a single person in a less volatile venue. Given the number of persons inside the Club, detention of plaintiffs for as long as reasonably required for the police to search the premises and to search and arrest the individuals named in the warrant may have been permissible.[57] What occurred, however, was a detention that lasted much longer than necessary specifically because of the pervasive and protracted

---

[57] The ultimate standard of reasonableness in the Fourth Amendment and the fact-specific character of these cases dissuade us from attempting to decide exactly what would have been a permissible period of detention had the police conducted a lawful search. In other contexts, we have held that when an officer pats down a person whom he reasonably suspects is carrying a weapon, and finds nothing, the officer may not further detain the individual, because his suspicion "has evaporated and no longer justifies further detention." United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993). Similarly, it is well-established in this Circuit that a detention should end as soon as the underlying justification for the stop is served, for instance by running a computer check that comes back negative; any further detention becomes an unreasonable seizure because it is unsupported by probable cause. United States v. Dortch, 199 F.3d 193, 199 (5th Cir. 1999).

illegal strip searching that occurred.  We cannot credit an argument that such a lengthy detention, including the time that elapsed both before and after plaintiffs were strip searched, was justifiable simply because the police elected to strip search scores of other Club customers.

In sum, the exception carved out in Summers, and shaped in Heitschmidt, is inapplicable here.  Because the law enforcement interest proffered does not justify such lengthy, public intrusions on plaintiffs, we hold the prolonged detention of plaintiffs to be unlawful.

2.   Whether the law was "clearly established"

Although we hold today that the prolonged detention of plaintiffs was unlawful, we nonetheless agree with the district court that qualified immunity shields Harris from liability.  Even though Summers does not sanction Harris's conduct, neither did it establish a clear rule warning defendants that such conduct was illegal.   The Court only hinted that "[a]lthough special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case, we are persuaded that this routine detention of residents of a house while it was being searched for contraband pursuant to a valid warrant is not such a case."[58]   Furthermore, Heitschmidt, which clarifies our views regarding these types of detentions, was not decided until after

_____

[58] Summers, 452 U.S. at 705, n.21.

Harris's search of the Club.

In the instant case, there is no doubt that the illegal strip search of plaintiffs corrupted the legality of their detention by extending it unnecessarily. Still, the objective unreasonableness of Harris's conduct in ordering a strip search of plaintiffs does not automatically make his conduct in unduly detaining plaintiffs for the duration of the search objectively unreasonable in and of itself. Whereas <u>Ybarra</u> established the clear rule that any full search of plaintiffs required individualized probable cause, <u>Summers</u> allows a seizure without probable cause when the proper balance is struck between law enforcement and personal security interests. Thus, <u>Summers</u> left the state of the law more ambiguous as to what constituted an unlawful detention in a premises search like the one here. In other words, under the law as it existed in April, 1995, Harris had fair warning that his generalized law enforcement safety interests did not justify strip searching plaintiffs; the law was less clear about whether these same interests were sufficient to permit detention of plaintiffs until the completion of the otherwise unlawful search. We agree with the district court's grant of qualified immunity on plaintiffs' unlawful detention claims.

F.  **Invasion of Privacy**

The district court rejected plaintiffs' invasion of privacy claim on summary judgment because the then-current pleading before

30

the court, the original complaint, did not state this claim. The magistrate judge had — in his words — "unfiled" plaintiffs' amended complaint (which included the privacy claim) for failure to follow procedural rules, and then rejected plaintiffs' second attempt to amend the complaint. Plaintiffs never objected to or sought review of these rulings. On appeal, plaintiffs still do not contest the magistrate judge's decision to reject their amended complaints, and instead argue that the Fourth Amendment claim pleaded in the original complaint includes the claim against invasion of privacy.

To the extent that plaintiffs' claim of invasion of privacy rests on the Fourth Amendment, it fails because it is redundant to their illegal strip search claim. Even assuming that the plaintiffs could establish that strip searches were not conducted in the privacy normally required (now a contested issue of fact), this transgression is inseparable from the illegal strip search violation itself. By finding the strip searches themselves unlawful, there is no need to address a particular aspect of searches that is potentially unlawful as well.[59] If, perhaps, defendants were within their constitutional authority to strip search plaintiffs to begin with, but impermissibly conducted the

---

[59] See Moore v. Cornwell, 168 F.3d 234, 236-37 (5th Cir. 1999)(holding that a strip search of a male prisoner by a female officer in the absence of emergency circumstances constitutes a claim that "could entitle [plaintiff] to relief for a Fourth Amendment violation.").

strip search in a public area, then plaintiffs may have had a privacy-oriented Fourth Amendment claim. But those are not the facts before us today. To the extent plaintiffs purport to make a separate invasion of privacy claim, it was not included in their original complaint, and they do not appeal the rejection of their attempts to amend that complaint. Thus, it is unnecessary for us to address such a claim.

G.    **Use of Racial Epithets**

The district court held that plaintiffs' oral harassment claim was insufficient because plaintiffs failed to make an equal protection claim or even refer to the Fourteenth Amendment in their pleadings. The court also concluded that even if plaintiffs had adequately pleaded an equal protection claim, the law was not clearly established that, in the instant context, racial slurs alone are actionable under the Fourteenth Amendment. On appeal, plaintiffs argue that the racial slurs allegedly used by the police violate the Fourth Amendment, because the Fourth Amendment embraces all elements of a search and seizure. To support their assertion that oral racial harassment violates the Fourth Amendment, however, plaintiffs rely on precedent prohibiting racial insults and discrimination under the Fourteenth Amendment.[60] Plaintiffs attempt

---

[60] They cite <u>Johnson v. Morel</u>, which describes plaintiff's claim of oral racial harassment as an equal protection claim under the Fourteenth Amendment. 876 F.2d 477, 478 (5th Cir. 1989).

to explain, with little justification, that although the prohibition against oral harassment based on race occurred in the context of the Equal Protection clause, the same prohibition is part of the Fourth Amendment and thus applies to police conduct.

We agree with the district court that use of racial epithets deserves our strongest condemnation. None would dispute that this form of harassment is highly reprehensible, even more so if it occurred in conjunction with the already invasive and humiliating strip searches.

Nevertheless, as appalling as such behavior would be, here it would only aggravate a seizure that we have already concluded was unlawful. Thus, whether the use of racial epithets alone amounts to a separate and independent constitutional violation under the Fourth Amendment is a question we need not reach because it is not before us today. We _have_ impliedly held that racial epithets that accompany harassment or a violation of established rights may amount to a separate equal protection violation.[61] In this case, however, for whatever reason, plaintiffs chose not to make an equal protection claim.

H.   **Municipal Liability**

At the summary judgment stage, the district court concluded

---

[61] See Williams v. Bramer, 180 F.3d 699, 706 (5th Cir. 1999) (holding that "an officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation").

33

that Harris's strip search and detention of plaintiffs was the official policy, practice and custom of the County because Harris was the final policymaker in law enforcement. After trial, the court also concluded that (1) plaintiffs suffered an injury as a result of this policy, and (2) the policy was adopted with "callous and deliberate indifference to the constitutional rights of those affected." On appeal, plaintiffs maintain that, as Harris was the official policymaker for the County, his role makes the County liable for the strip search and detention that Harris initiated and pursued with respect to plaintiffs.

The law is well-established that a municipality such as the County can be held liable for its policies and customs that engender constitutional deprivation, but that it cannot be held liable for the actions of its non-policy-making employees under a theory of <u>respondeat superior</u>.[62] In <u>Webster v. City of Houston</u>, we concluded that an official policy consists of, among other things, "[a] policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority."[63] We have also held that sheriffs in

---

[62] <u>Colle v. Brazos County</u>, 981 F.2d 237, 244 (5th Cir. 1993) (<u>citing</u> <u>Monell v. New York City Dept. of Soc. Serv.</u>, 436 U.S. 658 (1978) <u>and</u> <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 817-18 (1985)).

[63] 735 F.2d 838, 841 (5th Cir. 1984) (en banc).

34

Texas are final policymakers in the area of law enforcement. [64] Therefore, it is clear that the County can be held liable for Harris's intentional conduct, to the extent it constitutes the "moving force" behind the alleged injury.[65]

Harris testified that he is the final policymaker for law enforcement matters in the County. Harris and others have testified as well that both the strip search and lengthy detention of the plaintiffs were conducted according to the Sheriff Department's unwritten policy for executing "hazardous" warrants. As a result, Harris's actions as policymaker were undeniably the moving force behind, and the direct cause of, the violation of plaintiffs' constitutional rights, thereby establishing the County's municipal liability.[66] Finally, we note that the County

---

[64] Colle, 981 F.2d at 244 (citing Turner v. Upton County, 915 F.2d 133, 136 (5th Cir. 1990)).

[65] See Bryan County v. Brown, 520 U.S. 397, 404 (1997).

[66] See id. 404-05 (1997) ("the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains"). The district court did not need to determine whether Harris's conduct also amounted to deliberate indifference, because that element must be shown only when there is a claim that the municipality's facially lawful action caused an employee to inflict the injury, not when the municipality (through its policymaker) has directly caused the injury, as has occurred here. Thus, it is unnecessary to examine the deliberate indifference issue to establish liability in this instance. See id. at 406-07 (reiterating that a "plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious

35

has not expressly contested its municipal liability, but rather argued only that it is not liable for actions that do not amount to constitutional violations, a truism that none contests.

## I.   **Damages**

The district court rejected plaintiffs' request for compensatory damages because it found that plaintiffs had failed to prove a specific and discernable injury to their respective emotional states.   Nevertheless, the court awarded plaintiffs nominal damages of $100 per plaintiff, and punitive damages of $15,000 per plaintiff against Harris in his individual capacity. Finding that Harris's conduct "simply cannot be tolerated in a civilized society," the court concluded that punitive damages were an appropriate punishment.

On appeal, Harris argues that: (1) nominal damages should have been one dollar; (2) punitive damages were inappropriate because Harris lacked evil intent or reckless and callous indifference when carrying out the strip search and detention; and (3) even if punitive damages were permissible, the district court's award was excessive.   Plaintiffs do not contest the rejection of their compensatory damages claim.

### 1.   Nominal Damages

The law is well-established in this Circuit that plaintiffs may recover nominal damages when their constitutional rights have

consequences") (citation omitted).

been violated but they are unable to prove actual injury.[67] The district court relied on the definition of nominal damages from Black's Law Dictionary which equates such damages with a "trifling sum."[68] The court stated that it considered $100 to be nominal "[g]iven the value of today's dollar."

In Cary v. Piphus, the Supreme Court recognized the ability of courts to award "a nominal sum of money" when a violation of one's rights does not result in actual injury, and awarded nominal damages of one dollar.[69] The Court did not indicate, however, that in 1978 one dollar was the outer limit of such damages. Although $100 is obviously greater than one dollar, this amount is certainly not out of line with nominal damages that we have awarded in the commercial state law context.[70] We agree with the district court (and regret), moreover, that today $100 is an insignificant sum, and thus see no need to disturb that court's conclusion. Further, the court's assessment of the situation is not clearly erroneous, much less an abuse of discretion.

---

[67] Louisiana Acorn Fair Housing v. LeBlanc, 211 F.3d 298, 302 (5th Cir. 2000) (citing Ryland v. Shapiro, 708 F.2d 967, 976 (5th Cir. 1983)).

[68] Black's Law Dictionary, 396 (7th ed. 1999).

[69] 435 U.S. 247, 266-67 (1978).

[70] In the commercial context, we have awarded $2000 in nominal damages and cited as guidance state courts that have awarded between $500 and $5000 in nominal damages for commercial disputes. See Taquino v. Teledyne Monarch Rubber, 893 F.2d 1488, 1491 (5th Cir. 1990).

37

## 2.  Punitive Damages

Just as nominal damages are allowed without proof of injury, "a punitive award may stand in the absence of actual damages where there has been a constitutional violation."[71]  But punitive damages may be awarded only when the defendant's conduct "is 'motivated by evil intent' <u>or</u> demonstrates 'reckless or callous indifference' to a person's constitutional rights."[72]  The latter standard requires "recklessness in its subjective form," i.e. "a 'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.'"[73]  The district court held that Harris demonstrated a reckless indifference; Harris insists that he acted in good faith.

The record provides more than enough evidence from which to conclude that Harris acted with reckless indifference toward the constitutional rights of plaintiffs.  Although Harris told the court that he believed that he had probable cause to suspect that everyone in the Club had some connection to drugs, it was well-established at the time of this search that Harris needed individualized probable cause to search each of the plaintiffs and the ninety-plus other individuals at the Club who were not named in

---

[71] <u>LeBlanc</u>, 211 F.3d at 303.

[72] <u>Sockwell v. Phelps</u>, 20 F.3d 187, 192 (5th Cir. 1994) (<u>citing</u> <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983)) (emphasis added).

[73] <u>Kolstad v. Am. Dental Ass'n</u>, 527 U.S. 526, 536 (1999) (<u>citing</u> <u>Smith</u>, 461 U.S. at 37, n.6, 41).

the warrant. Not only did Harris lack particularized probable cause when entering the Club, none materialized vis-à-vis the plaintiffs after a patdown. Without any probable cause or articulable reasonable suspicion after a patdown, Harris simply had no legal authority to conduct a strip search. Moreover, the magistrate who issued the search warrant gave Harris only enough authority to search the premises and the five individuals named in the warrant, not all others in the Club as requested in Harris's affidavit. We conclude that ignoring the limited scope of search authorized by the warrant, and disregarding the Fourth Amendment rights of plaintiffs as long-established by the Supreme Court and recognized by this Court,[74] constitutes reckless indifference to such rights. In addition, in light of the testimony detailing the atmosphere of questionable privacy during the strip searches and the use of racial slurs, we cannot fault the district court's ruling that Harris was not acting in legal good faith. Even though Harris is no longer Sheriff, punitive damages not only punish him for his conduct; they serve as instructive warnings to his successors.

Harris nevertheless contends that, even if punitive damages are appropriate, the damages awarded by the district court were excessive. To determine whether punitive damages are excessive,

---

[74] See United States v. Harvey, 897 F.2d 1300, 1304 (5th Cir. 1990)(recognizing and applying Ybarra, but distinguishing the facts of the case from its holding).

the Supreme Court requires consideration of three factors (1) the degree of reprehensibility of the defendant's conduct, which receives the heaviest weight; (2) the disparity between the harm suffered (compensatory damages) and the punitive damages award; and (3) the possible criminal and civil sanctions for comparable misconduct.[75]

As outlined above, the degree of reprehensibility of Harris's conduct is high because he perpetrated extremely invasive searches on innocent individuals without specific probable cause or reasonable suspicion, in contravention of the warrant itself and clear precedent. Second, we agree with the district court that any punitive damages-to-compensatory damages "ratio analysis" cannot be applied effectively in cases where only nominal damages have been awarded, such as the § 1983 suit before us. The Supreme Court has counseled that this factor does not impose a mathematical formula for constitutional proportionality, but instead only embodies "a general concern of reasonableness."[76] Because actions seeking

---

[75] BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575, 580, 583 (1996).

[76] Id. at 582-83 (citation and internal quotation marked omitted). The Supreme Court's recent revisit of the Gore factors in State Farm Mutual Automobile Insurance Company v. Campbell does not alter our conclusion here. __ U.S. __, 123 S.Ct. 1513 (2003). Campbell reviewed jury-awarded compensatory damages of $1 million and punitive damages of $145 million; and although the Court stated that extreme ratios should be presumptively invalid, it discussed the constitutionality of punitive damages vis-a-vis compensatory damages awarded by juries. See id. at 1521, 1524. As the instant case concerns the ratio between punitive and nominal damages, Campbell's discussion of the proper ratio

vindication of constitutional rights are more likely to result only in nominal damages, strict proportionality would defeat the ability to award punitive damages at all.[77]  Based on our review of the case law and our consideration of the evidence weighed by the district court, we conclude that $15,000 per plaintiff is not unreasonable in light of the violations that took place.[78]

J.   **Declaratory Relief**

Finally, Harris and the County contend that they did not violate Article I, section 9 of the Texas Constitution, which

---

between punitive and compensatory damages is inapposite to our consideration today.

[77] The third factor, what comparable criminal and civil sanctions would have been for Harris, is not easily applicable to this type of constitutional violation, because there is no readily identifiable law imposing civil or criminal penalties on law enforcement officers for such violations.

[78] Our research has revealed relatively few other cases addressing the amount of punitive damages awarded in the context of civil rights actions. The Second Circuit concluded that $10,000 in punitive damages when only nominal damages were awarded "approaches the limits of what we would deem consistent with constitutional constraints."  Provost v. City of Newburgh, 262 F.3d 146, 164 (2nd Cir. 2001).  In a case concerning the illegal strip search of a prisoner, the Seventh Circuit reduced a jury-decided punitive damages award of $15,000 to $6,000. McKinley v. Trattles, 732 F.2d 1320, 1327-28 (7th Cir. 1984). For the illegal strip search of high school students, the New Mexico Supreme Court approved punitive damages awards of $62,500 to one plaintiff and $37,500 to the other plaintiff, but also awarded compensatory damages of $50,000 to each.  Kennedy v. Dexter Consol. Sch., 10 P.3d 115, 118, 125-126 (N.M. 2000). Although $15,000 may be slightly higher in this case than in cases decided by other circuits, two factors convince us that the amount is nonetheless reasonable: (1) our review of the evidence before the district court regarding the type of conduct that occurred, and (2) our necessarily unscientific balancing of the factors laid out in Gore.

41

mirrors the language of the Fourth Amendment. Both parties acknowledge that this constitutional provision is interpreted as congruent with Fourth Amendment jurisprudence. Indeed, the Texas Court of Appeals has held that "our article I, section 9 provides at least as much protection as the Fourth Amendment of the United States Constitution."[79] Thus, based on our earlier conclusions that Harris and the County violated the Fourth Amendment, we also conclude that the declaratory relief granted to plaintiffs is appropriate.

### III. CONCLUSION

For the foregoing reasons, the judgments of the district court are, in all respects,

AFFIRMED.

---

[79] State v. Wagner, 821 S.W.2d 288, 291 (Tex. Crim. App. 1991).