IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 18, 2008

Charles R. Fulbruge III
Clerk

No. 07-40662

EVELYN LEWIS,

                              Plaintiff-Appellee-Appellant,

v.

LARRY PUGH, Former Police Officer,

                              Defendant-Appellant,

MARK JOHNSON, Former City of Jacksonville Police Chief; CITY OF
JACKSONVILLE, TEXAS,

                              Defendant-Appellees.

Appeals from the United States District Court
for the Eastern District of Texas
(06-CV-357)

Before JONES, Chief Judge, BARKSDALE and STEWART, Circuit Judges.

PER CURIAM:[*]

    Plaintiff-Appellee-Appellant Evelyn Lewis brought this 42 U.S.C. § 1983
action after being sexually assaulted by Defendant-Appellant Larry Pugh, a
former City of Jacksonville Police Officer, in March 2005. Lewis sought damages

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

against Pugh, as well as Defendants-Appellees City of Jacksonville ("City") and former police chief Mark Johnson. The district court granted summary judgment to the City and Johnson, but Lewis obtained a $300,000 jury verdict and judgment against Pugh. Lewis now appeals the district court's grant of summary judgment to the City and Johnson, while Pugh appeals the jury verdict and judgment entered against him. For the following reasons, the judgment of the district court is AFFIRMED.

I.

In March 2005, Pugh offered Lewis a ride while she was walking home from a friend's house early in the morning. Pugh, employed at the time as a City police officer, was in uniform, armed with a gun, and driving a police vehicle. Lewis accepted the ride and Pugh took Lewis to an abandoned trailer house and raped her. Pugh then drove Lewis home.

Lewis asserts that she contacted City Police Detective Tonya Harris[1] the next day, but was unable to reach her. Lewis eventually spoke to Harris and Assistant City Police Chief John Page, and Lewis told Page that Pugh had raped her. Page told her that he would like to talk to her in person, but Lewis told him that she would prefer to speak with Harris. Subsequently, Page attempted to contact Lewis to interview her, but was unable to reach her. A day or two after the initial report, Page came to Lewis's house, but Lewis again said that she would feel better speaking to Harris. Eventually Lewis met with Harris and told her what had happened. At some point, Lewis also signed a written statement describing the rape.[2]

---

[1] In the record, Tonya Harris is also referred to as Tonya Sonntag and Sonya Sonntag. For consistency, in this opinion we will use the name Tonya Harris.

[2] According to the City, Page tried repeatedly to contact Lewis for an interview, but was unable to reach her until July 21, 2005. At that time she declined to repeat her accusations to Page. Page continued to try and reach Lewis to schedule her for a follow-up interview, but was unable to locate her until October 2005.

Lewis later spoke with Joe Evans, an investigator for the Cherokee County District Attorney, and told him about the rape.[3] In October 2005, Lewis gave Evans a written statement. Lewis also spoke with the FBI about the incident.

According to the City, on October 21, 2005, then-police chief Johnson and Page met with Evans and learned that Lewis had repeated her allegations to the district attorney. Johnson testified that he contacted Pugh that day and placed him on suspension. Johnson stated that Pugh did not serve as a City Police Department officer after that date. On February 8, 2006, after being notified by the FBI that Pugh had been arrested on charges of sexual assault, Johnson terminated Pugh's employment with the City of Jacksonville.

On August 6, 2006, Pugh assaulted Lewis in retaliation for Lewis's report of the previous assault. Specifically, while driving his personal vehicle, Pugh offered Lewis a ride. When Lewis declined, Pugh confronted Lewis, wrapped his belt around her neck, and began dragging Lewis towards his van. Lewis was injured, but managed to get away from Pugh before he was able to place her in the van.

In September 2006, Pugh plead guilty to charges stemming from his two assaults on Lewis and his assault on another woman. Specifically, he plead guilty to two counts of violations of 18 U.S.C. § 242, deprivation of rights under color of law, and one count of a violation of 18 U.S.C. § 1513(b), retaliation against a witness. Pugh was sentenced to a 12 year sentence on March 1, 2007.

II.

Lewis filed suit in federal district court under 42 U.S.C. § 1983 on August 14, 2006, claiming that the assaults by Pugh violated her rights under the Fourth Amendment. Lewis also alleged that the City and Johnson were liable under § 1983 because of their failure to supervise Pugh, their hiring and

---

[3] The City and Johnson contend that they initiated contact with the district attorney's office, informing the office of Lewis's allegations.

retention of Pugh, and their tolerance of Pugh's misconduct. Lewis also alleged state law assault and battery claims against Pugh based on Pugh's August 9, 2006 attack against her.

In May 2007, the district court granted the City and Johnson's motion for summary judgment, concluding that Lewis had failed to establish a genuine issue of material fact as to whether the City and Johnson acted with deliberate indifference in the supervision, hiring, training, and retention of Pugh. The district court also concluded that Lewis failed to produce evidence that any policies or procedures were the moving force behind Lewis's injuries.

Lewis's claims against Pugh proceeded to trial in June 2007. Pugh stipulated to liability,[4] so the jury determined only the amount of damages to be awarded to Lewis. On June 12, 2007, the jury returned a verdict awarding Lewis $50,000 in compensatory damages, as well as $250,000 in punitive damages. Subsequently, the district court entered final judgment against Pugh in the amount of $300,000 plus interest, and dismissed Lewis's claims against the City and Johnson.

Lewis now appeals the district court's grant of summary judgment to the City and Johnson. In addition, Pugh, pro se, appeals the jury's verdict against him.

## III.

As noted above, the district court granted summary judgment to the City and Johnson on three claims: failure to supervise; deficient hiring or retention; and deficient procedures for the discovery of police misconduct. As an initial matter, Lewis's brief makes no argument regarding her deficient hiring and retention claim, and, as such, we consider this issue waived. See St. Paul

---

[4] However, at trial, Pugh denied committing either of the assaults against Pugh. He admitted to pleading guilty to criminal charges and to signing a factual resume detailing the assaults, but stated that he only did so for the "benefit of his family," not because he was guilty.

Mercury Ins. Co. v. Williamson, 224 F.3d 425, 445 (5th Cir. 2000) (arguments not raised on appeal are deemed abandoned); In re Tex. Mortg. Servs. Corp., 761 F.2d 1068, 1073 (5th Cir. 1985) ("[I]ssues not raised or argued in the brief of the appellant may be considered waived and thus will not be noticed or entertained by the court of appeals."). Therefore, on appeal, we will only address Lewis's claims of inadequate supervision and inadequate complaint policies and procedures.

A.

This Court reviews a district court's grant of summary judgment de novo, applying the same standards as the district court. Strong v. Univ. Healthcare Sys., L.L.C., 482 F.3d 802, 805 (5th Cir. 2007). "Summary judgment is proper when there exists no genuine issue of material fact and the movant is entitled to judgment as matter of law." Id. (citing FED. R. CIV. P. 56(c)). "The evidence and inferences from the summary judgment record are viewed in the light most favorable to the nonmovant." Minter v. Great Am. Ins. Co. of N.Y., 423 F.3d 460, 465 (5th Cir. 2005).

B.

Lewis's claims are brought under 42 U.S.C. § 1983. To state a claim pursuant to § 1983, a plaintiff must claim a violation of a right secured by the Constitution or laws of the United States and demonstrate the alleged deprivation was committed by a person acting under color of state law. See 42 U.S.C. § 1983; Randolph v. Cervantes, 130 F.3d 727, 730 (5th Cir. 1997). Lewis has brought suit against the City, as well as against Johnson. A municipality may be held liable under § 1983 when its official policies or customs violate the Constitution. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978). However, a municipality will not face liability under a respondeat superior liability theory. Monell, 436 U.S. at 691. Instead, the plaintiff must identify the specific policy or custom, and show that the final policy maker, through its

"deliberate conduct," was the "moving force" behind the violation. Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 405 (1997). Lewis sued Johnson in both his individual and official capacity. This Court has explained that official-capacity suits should be treated as suits against the government entity, see Turner v. Houma Mun. Fire and Police Civil Serv. Bd., 229 F.3d 478, 483 (5th Cir. 2000); therefore, Lewis's claims against Johnson in his official capacity merge with her claims against the City.

C.

Lewis first argues that the City and Johnson are liable because Johnson's failure to adequately supervise Pugh caused her injury. The same standards of fault and causation apply to an individual supervisor's liability and the liability of a municipality for failure to supervise. Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 453 (5th Cir. 1994) (en banc). Thus we will analyze Lewis's claims against Johnson in his individual capacity and her claims against the municipality together. To succeed on her claim, Lewis must show that: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of [her] rights; and (3) the failure to train or supervise amounts to deliberate indifference." Smith v. Brenoettsy, 158 F.3d 908, 911-12 (5th Cir. 1998).

With respect to the third prong, we have previously stated that: "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Estate of Davis v. City of N. Richland Hills, 406 F.3d 375, 381 (5th Cir. 2005) (quoting Brown, 520 U.S. at 410). "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. Proof of more than a single instance of lack of supervision causing a violation of constitutional rights is required before such

lack of training can constitute deliberate indifference. Thompson v. Upshur County, 245 F.3d 447, 458 (5th Cir. 2001). Instead, the plaintiff must generally demonstrate that the municipality or supervisor had notice of a pattern of prior acts "fairly similar to what ultimately transpired." Davis, 406 F.3d at 383; see also Thompson, 245 F.3d at 458.

The record contains the following evidence regarding Lewis's supervisory claim. First, in her deposition, Lewis states that Detective Harris told her that "they had a suspicion" about Pugh prior to his rape of Lewis. Second, Lewis points to the testimony of Johnson that in June 2005 he became aware that Pugh had molested a number of women, however he did not know whether these rapes occurred before or after the March 2005 rape of Lewis. Johnson also testified that he was subsequently suspended for failing to properly supervise the police department, and that he retired in June 2006. Third, Lewis presents evidence of a number of claims stemming from Pugh's October 22, 2004 use of allegedly excessive force against a number of spectators after a high school football game at the Tomato Bowl in Jacksonville, Texas. Lewis produced the declarations of four spectators, all of whom allege that Pugh used excessive force against them and/or arrested them without probable cause. Lewis also presented evidence that Johnson was aware of at least one of the Tomato Bowl complaints. Fourth, Lewis presents evidence that Investigator Evans, in the fall of 2005, interviewed several other women who stated that Pugh had assaulted them. There is no evidence in the record that these women had reported the assaults or filed complaints against Pugh prior to March 2005. Finally, Lewis points to the testimony of Assistant Police Chief John Page, who stated that in early June 2005 he became aware that a number of women, including Lewis, were alleging that Pugh committed sexual misconduct against them.

Even accepted as true and taken as a whole, the above evidence is legally insufficient to support a finding of deliberate indifference. At most, this evidence

shows that, prior to Lewis's March 2005 rape, Johnson had knowledge of four excessive force and unlawful arrest claims, all stemming from one incident – the Tomato Bowl arrests. There were no allegations of sexual misconduct related to the Tomato Bowl incident, nor did Lewis present any evidence that the City or Johnson had knowledge that Pugh committed any other sexual offenses prior to March 2005.[5] We have stressed that to demonstrate "deliberate indifference," a plaintiff must show "a pattern of similar incidents." Davis, 406 F.3d at 382-83. Even assuming that the four Tomato Bowl incidents, all occurring on the same date, constitute a "pattern," these incidents allegedly involved the use of excessive force during arrests, not sexual misconduct. While we have cautioned that "the specificity required should not be exaggerated," our caselaw requires that "the prior acts be fairly similar to what ultimately transpired." Id. at 383. "Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." Id. Here, other than the fact that both incidents involved alleged violence committed by Pugh, there is little similarity between the allegedly excessive force used to effectuate the arrests at the Tomato Bowl and the intentional, violent, rape of Lewis. Given the dissimilarity between the two incidents, we cannot conclude that Lewis established a triable issue of fact with respect to whether Johnson and the City were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," id. at 381, that Pugh was likely to commit a

---

[5] Lewis relies heavily on the testimony of Page and Johnson that in June 2005 they became aware of allegations of sexual misconduct by Pugh, and that some of the misconduct may have occurred prior to Lewis's rape. However, this awareness arose only after Pugh's rape of Lewis, and thus could not have put Johnson or the City on notice of any propensity for sexual violence by Pugh. See, e.g., Cano v. Bexar County, No. 07-50921, 2008 U.S. App. LEXIS 11990, at *6 (5th Cir. June 4, 2008) ("Of course, the investigations subsequent to the instant incident are not relevant because such incidents could not have informed [the] County's judgment with respect to the instant claim."). Lewis also produced other evidence of various claims of excessive force and sexual misconduct arising after the March 2005 rape of Lewis. However, again, because these incidents all occurred after Lewis's rape, they could not have provided the City or Johnson with the required notice, and are not relevant to Lewis's claim.

violent rape and assault.  See also Roberts v. City of Shreveport, 397 F.3d 287, 294 (5th Cir. 2005) (rejecting plaintiffs' proffered pattern where it required "an excessively high level of generality").  In sum, there is no conduct from which it could be reasonably concluded that Johnson or the City made a deliberate or conscious choice to endanger constitutional rights.  Consequently, we affirm the district court's dismissal of this claim.

D.

Lewis next argues that the City and Johnson are liable because Defendant Johnson had a policy of tolerating police misconduct, such as excessive force and unlawful arrests, and the City had inadequate procedures for documenting and investigating complaints of police misconduct.[6]  The district court appears to have addressed these claims together, and Lewis's brief is unhelpful in determining whether she is alleging one unconstitutional policy or two.  However, for the sake of completeness, we address these two distinct claims separately.

As discussed above, a municipality faces § 1983 liability only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. . . ."  Monell, 436 U.S. at 694.  "Proof of municipal liability sufficient to satisfy Monell requires: (1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)."  Pineda v. City of Houston, 291 F.3d 325, 328 (5th Cir. 2002).  For a municipality to be

---

[6] Lewis's briefing on this point is particularly confusing.  Although Lewis identifies this argument as an issue in her "Statement of Issues," she fails to specifically identify the exact policy or custom complained of and her argument section seems to focus only on her supervisory liability claim.  Nonetheless, Defendants have briefed this issue, so despite the inadequacy of Lewis's briefing, we will attempt to discern Lewis's argument and address it on appeal.

liable on account of its policy, the plaintiff must show, among other things, either (1) that the policy itself violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers "with 'deliberate indifference' as to its known or obvious consequences." Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force, 379 F.3d 293, 309 (5th Cir. 2004) (quoting Brown, 520 U.S. at 407). As chief law enforcement officer during the time in question, Johnson "may be held personally liable if he implemented 'a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.'" Ibarra v. Harris County, 243 Fed. App'x 830, 836 (5th Cir. 2007) (quoting Cozzo v. Tangipahoa Parish Council, 279 F.3d 273, 289 (5th Cir. 2002)).

### 1.     Policy of Tolerating Police Misconduct

First, Lewis has not sufficiently demonstrated that the City or Johnson had a custom of tolerating misconduct or inadequately responding to citizen complaints.

In support of her claim that Johnson had a policy of tolerating police misconduct, Lewis points to the following incidents of police misconduct. First, she submitted evidence of police misconduct at the Tomato Bowl incident in 2004. In addition, she presented evidence of another incident of alleged excessive force by Pugh, occurring on October 2, 2005, when Pugh allegedly used excessive force against Larry Lacey during a traffic stop. Further, Lewis points to Johnson's testimony that Pugh committed a number of other sexual assaults. Lewis also cites to an incident in which three officers allegedly maced and beat up a man named "Burke," who was being held in the city jail for DWI. Finally, Lewis presented evidence that Johnson was suspended twice – once in 2003 for allegedly lying to the City Manager and again in 2006 for improperly managing the police department.

However, there is simply no evidence in the record that the City "tolerated" these incidents of misconduct or other incidents of this nature. To the contrary, the testimony in the record indicates that each of these incidents was investigated,[7] and in some cases, including the case of Pugh, the officers were subsequently suspended. Lewis has presented no testimony that the City or Johnson condoned officers' use of excessive force or unlawful arrests. Further, given the relatively few number of incidents of allegedly excessive force and unlawful arrests, we cannot conclude that such behavior was sufficiently "widespread and pervasive" to demonstrate a pattern of unconstitutional behavior. See Pineda, 291 F.3d at 329 (holding that eleven incidents of allegedly unconstitutional searches were insufficient to demonstrate a genuine issue of material fact as to whether there was a custom of unconstitutional searches); Castro v. McCord, 259 Fed. App'x 664, 669 (5th Cir. 2007) (evidence of three shooting deaths in five years prior to trial insufficient to establish a "persistent, widespread practice" of shootings by county officers); Roberts v. City of Shreveport, 397 F.3d 287, 295 (5th Cir. 2005) (evidence that officer brandished his handgun during a traffic stop, committed one other incident of deadly force, and was accused of two other claims of excessive force insufficient to establish a "pattern" of unconstitutional conduct).

In addition, even if Lewis could establish that the City and Johnson had a custom of tolerating misconduct that was maintained with deliberate

---

[7] Lewis argues that no investigation was taken after the Lacey incident, but her citation to Johnson's deposition testimony does not support that assertion. During Johnson's deposition, counsel for the City stated that he was unwilling to stipulate that no investigation had occurred, but would stipulate that "at this time I have seen no formal file of an internal affairs investigation." Johnson then testified that he ordered Lieutenant Page to investigate the incident, but that he "[did]n't remember if there was an actual internal affairs investigation, or if it was said, 'Hey, turn this over to the FBI.' I know we turned it over to the FBI immediately." Nothing in the record supports Lewis's assertion that the department never investigated the incident. Further, it is undisputed that the City held a community meeting in response to the incident.

indifference to the constitutional rights of the City's residents, she failed to present any evidence that this custom was the "moving force" behind the complained of constitutional violation. As we said in Fraire v. City of Arlington, 957 F.2d 1268, 1281 (5th Cir. 1992):

> [A] direct causal connection must exist between the policy and the alleged constitutional deprivation. This connection must be more than a mere 'but for' coupling between cause and effect. To form the basis of liability under § 1983, a municipal policy must be affirmatively linked to the constitutional violation and be the moving force behind it.

(footnotes omitted). The actions of Pugh in raping and assaulting Lewis in March 2005 were entirely caused by Pugh. There is simply no evidence in the record that Pugh made the decision to rape Lewis for any reason related to any City policy or custom or understanding thereof which he may have had, or for any reason other than his own motivations for assaulting Lewis. In fact, Lewis herself has referred to Pugh as a "rogue" police officer. In sum, the evidence shows no causal connection between the City's allegedly unconstitutional policy and the actions of Pugh. See Johnson, 379 F.3d at 310-11; Hardeman v. Kerr County, 244 Fed. App'x 593, 597 (5th Cir. 2007).

Therefore, the district court properly dismissed Lewis's claim based on an alleged custom of tolerating police misconduct.

### 2. Inadequate Procedures for Recording Citizen Complaints

Second, Lewis failed to present evidence sufficient to support her claim that the City should be held liable because it lacked proper procedures to process citizen complaints of police misconduct. Lewis directs the court to Johnson's testimony that the police department logged only written complaints of officer misconduct, and did not keep records of verbal complaints.[8] Lewis also points

---

[8] Regarding the police department's handling of complaints, Johnson testified that if a person came into the police station complaining of officer misconduct, the lieutenant would

to the testimony of Leisha Mosley, who stated that she tried to file a complaint of excessive force with the Jacksonville Police Department, but that she was told by the woman at the front desk that they did not have any forms.

"Knowledge on the part of a policymaker that a constitutional violation will most likely result from a given official custom or policy is a sine qua non of municipal liability under section 1983." Burge v. St. Tammany Parish, 336 F.3d 363, 370 (5th Cir. 2003). Where, as in the present case, "an alleged policy or custom is facially innocuous, establishing the requisite official knowledge requires that a plaintiff establish that an official policy was 'promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result.'" Id. (citing Piotrowski v. City of Houston, 237 F.3d 567, 579 (5th Cir. 2001)). It is undisputed that Johnson is a final policymaker and that Lewis suffered a violation of her Fourth Amendment rights, however Lewis has failed to produce any evidence that Johnson had knowledge that a Fourth Amendment violation would be a highly likely consequence of the record keeping policy. See Id. (affirming dismissal of § 1983 claim where plaintiff failed to produce sufficient evidence to establish deliberate indifference or knowledge on the part of the Sheriff that a Brady violation would be a highly likely consequence of the manner in which his office managed its records). Thus, the district court's grant of summary judgment was proper.

---

listen to the complaint, ask him to fill out a "packet," and then to return the "packet" so the department could investigate the misconduct. If the "packet" was returned, the complainant would keep a copy, the officer accused of misconduct gets a copy, and the officer's supervisor would get a copy in order to determine what investigation was necessary. Johnson testified that complaints made verbally of police misconduct were not documented or kept on file by the police department, but that written complaints were filed in the personnel file of the individual officer accused of misconduct. He testified that there was no central place where all complaints of excessive force or unlawful arrest were filed and that he wasn't aware of whether the department's current computer system contained a database of complaints. He indicated that the department was in the process of updating the computer system so that there would be a data bank of complaints.

Even assuming that Lewis could prove that the City and Johnson were "deliberately indifferent" in not documenting oral complaints of misconduct, Lewis's claims were properly dismissed because she failed to establish the necessary "direct causal link" between this policy and the constitutional deprivation at issue – the rape committed by Pugh. See Johnson, 379 F.3d at 310-11

IV.

We now turn to Pugh's appeal of the judgment against him. On appeal, Pugh argues that both the compensatory and punitive damages awarded by the jury were excessive. In addition, Pugh contends that the verdict should be reversed because he received ineffective assistance of counsel.

The jury awarded Lewis $50,000 in compensatory damages, as well as $250,000 in punitive damages. An assessment of damages is not reversed unless it is clearly erroneous. Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 783 (5th Cir. 1983). Only where it is "so large as to shock the judicial conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive" will we reverse a jury verdict for excessiveness. Id.

Pugh argues that the award of $50,000 in compensatory damages was excessive because Lewis failed to mitigate her damages by promptly seeking treatment and failed to present sufficient evidence of pain and suffering related to the assaults. During the trial, Lewis described the March 2005 rape and the August 2005 assault, and the physical injuries she suffered. She further testified that since the attacks, she has felt humiliated, been "scared to do anything," "scared of the police," and "scared to go out at night." Lewis's daughter, Kenzie Blow, testified that the rape was "devastating" for Lewis, and that, immediately after the rape Lewis was upset and scared. Blow testified that Lewis suffered physical injuries from the rape, including bruising. Further,

Blow indicated that, at the time of trial, Lewis was still affected and was "very scared and very paranoid."  Finally, Lewis presented evidence that she was taken to the hospital after the August assault and treated for physical injuries, including abrasions and multiple cuts and scrapes on her legs.  Given the evidence and testimony presented at trial, the court is satisfied that there is sufficient evidence of physical injury, pain and suffering, and mental anguish to support the jury's verdict.  In short, we cannot say that an award of $50,000 resulting from the rape and subsequent assault is enough to "shock the judicial conscience" of the court.

In challenging the jury's award of $250,000 in punitive damages, Pugh contends that the award is excessive, unfair, and contrary to the jury instructions.  We construe Pugh's argument as a challenge to the constitutionality of the size of the punitive damages award.  The Supreme Court has articulated three factors that courts should consider in determining whether an award of punitive damages is constitutionally excessive: (1) the defendant's reprehensibility or culpability; (2) the relationship between the penalty and the harm to the victim caused by the defendant's actions; and (3) the sanctions imposed in other cases for comparable misconduct.  Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 434-35 (2001).  In the present case, we have no difficulty upholding the jury's award. First, Pugh's conduct, utilizing a position of trust to rape and assault a vulnerable woman, is particularly reprehensible.  Second, the ratio between the punitive and compensatory damages in this case is 5:1, a ratio not so disproportionate as to "jar one's constitutional sensibilities." TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 481  (1993) (indicating that a ratio between the punitive award and the potential harm of ten to one was not constitutionally infirm); see also Exxon Shipping Co. v. Baker, 128 S. Ct. 2605 (2008) (adopting a punitive-to-compensatory damages ratio to determine maximum punitive damages award);

cf. Watson v. Johnson Mobile Homes, 284 F.3d 568, 574 (5th Cir. 2002) (remitting punitive damages to $150,000 where jury awarded compensatory damages of $4,000, a ratio of 37.5:1). Finally, the comparable criminal sanctions for Pugh's conduct are serious, as indicated by the fact that he is currently serving a 12-year sentence for the rape and assault of Lewis. Therefore, we uphold the punitive damages award against Pugh.[9]

Pugh also argues that he received ineffective assistance of counsel during this litigation. This argument is without merit. It is well settled that the constitutional right to the effective assistance of counsel does not apply in a civil context. See F.T.C. v. Assail, Inc., 410 F.3d 256, 267 (5th Cir. 2005).

## V.

In conclusion, for the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[9] In addition, Pugh did not move for a new trial or remittitur in the district court, thereby depriving the district court of the opportunity to correct any alleged imperfections in the jury award. Therefore, arguably, Pugh did not preserve this issue for appeal. See Carlton v. H.C. Price Co., 640 F.2d 573, 577 (5th Cir. 1981) ("We have held that 'there can be no appellate review (of allegedly excessive or inadequate damages) if the trial court was not given an opportunity to exercise its discretion on a motion for new trial.'") (quoting Baker v. Dillon, 389 F.2d 57, 58 (5th Cir. 1968)).