Marcus D. HILL (Doc#: 310825)

v.

Tyrone KILBOURNE, et al.

CIVIL ACTION NO. 11–778–JWD–SCR

United States District Court,
M.D. Louisiana.

Signed November 10, 2015

See also 2014 WL 2830131, 2014 WL 2831191.

Donna Unkel Grodner, Grodner and Associates, APLC, Baton Rouge, LA, for Marcus D. Hill.

Babatunde Mobolade Animashaun, Louisiana Department of Justice, Baton Rouge, LA, for Tyrone Kilbourne, et al.

### RULING AND ORDER

JUDGE JOHN W. deGRAVELLES, UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA

This matter comes before the Court on the Defendants' Motion to Alter or Amend Judgment (R. Doc. 134) filed by Tyrone Kilbourne and Percy Babin. Plaintiff Marcus D. Hill opposes the motion. (R. Doc. 136). No oral argument is necessary. Considering the law, facts in the record, and the arguments of the parties, the Defendants' motion is denied.

### A. Factual and Procedural Background

#### 1. Introduction

I his is a case brought under 28 U.S.C. § 1983. Plaintiff claimed damages for excessive force applied in violation of his Eighth Amendment rights. A jury trial on this matter was conducted on March 16–17, 2015.

#### 2. Plaintiff Marcus Hill's testimony

At trial, the Plaintiff testified that, on September 2, 2011, he was an inmate at Dixon Correctional Center, a medium-security prison where the inmates have the freedom to walk around, visit, and engage in recreation when not working. On that day, it had started to rain, so he was walking toward his dorm. Hill passed Master Sergeant Kilbourne, who, after walking about twelve steps, turned and stopped Hill. Kilbourne asked, "What you got?", and Hill showed Kilbourne that his hands were empty. After searching the ground, Kilbourne said that Hill "must have chewed it ... must have ate something." Hill leaned his head and opened his jaws really wide, and Kilbourne looked inside his mouth. Hill even used his fingers to show that his mouth was empty. Hill testified that he complied with all orders, did not disobey Kilbourne, was not

aggressive and hostile toward him. and did not try to run away from him

According to Hill, at this time, Kilbourne grabbed Hill's neck and stuck his fingers in Hill's mouth, at which time Hill began to fall backward down a hill. After four or five different tumbles, Kilbourne ended up on top of Hill with his knees on Hill's back. Because of the rain, both were wet and had grass all over them. Kilbourne was pushing Hill's face into the ground, and Hill could hardly breathe.

Hill testified that Kilbourne then hit his beeper and called for backup.[1] Five or six officers then surrounded Hill and began putting their feet on his neck. They pulled Hill's hands apart and pulled his feet apart. They told Hill to turn to the side and spit, which he did. They cuffed and shackled Hill and then turned him back over. Hill identified Captain Babin and Kilbourne as two of the officers.

Hill said that the officers brought Hill to the bullpen and into the major's office, where there are no video cameras. The officers emptied the bullpen. Hill was standing in the middle with all of the officers except Kilbourne. Hill waited there for five minutes while the officers were questioning him about various things.

According to Hill, Kilbourne then came into the office. Hill turned toward him, and Kilbourne hit him in the ear. After that, the other officers engaged him. Hill fell between the desk and the wall. He was still handcuffed with his hands behind his back. Hill backed down and put his head between his legs. They continued to beat him and continued to hit him while asking questions and calling names. According to Hill, the only reason they stopped was because Hill said he was diabetic and that anything done to him would

be more detrimental than to a normal person. Finally, Kilbourne hit him one last time and said that it was for messing up his suit.

Hill said he was placed in a dry cell after the incident for three days. He said that the toilet did not flush. After a few days, the officers still found no contraband.

Hill testified that he was also not taken to see a doctor immediately and did not go to the infirmary on September 2, 2011. Hill testified that he suffered for three or four days in the hole. They then sent the nurse around but that the nurse did not enter the cell. Hill said his eye was hurting and that he had knots on his head but that the nurse did not come in and examine him. Hill said the nurse wrote that Hill was fine and left without doing anything.

Hill said he had knots on him, was swollen, and was in pain. Hill testified that, for days after the incident, his eyes were really sensitive to light, and he basically could not see out of one eye. He had to keep the hurt eye closed, which caused a headache.

Kilbourne wrote Hill up for three different defiances. As a result, Hill was placed in extended lockdown, where he could not go anywhere, use the phone, or have visits.

### 3. Durwin Abbot's testimony

Durwin Abbot, another inmate at the facility, testified that he observed Kilbourne and Babin bringing Hill to the bullpen. Hill was not trying to run, cursing, or struggling.

### 4. Douglas Stroughter's testimony

Major Douglas Stroughter testified that the prison rules prohibit excessive force and physical abuse. Further, the rules

---

1. On rebuttal, Hill denied Kilbourne's testimony (discussed below) that he used to be a bigger guy, said that Kilbourne was almost two times bigger than Hill, and that he could not possibly have been as aggressive as Kilbourne said.

prohibit invasive searches by anyone other than a physician and require an immediate medical exam after any physical confrontation. Stroughter further stated that his post orders allow inmates to be brought into the major's office for investigations of possible rule violations despite the fact that the offender rule book requires that the inmates be placed in administrative segregation.

Regarding the incident, Stroughter said that he was one of the officers that escorted Hill into the major's office, that they questioned Hill in the office, and that they brought Hill to the infirmary on that day for examination. Stroughter saw nothing else that day.

### 5. Anthony Miller and Frazier Bendtly's testimony

Plaintiff showed at trial that Anthony Miller's and Frazier Bendtly's affidavits given earlier in the suit were virtually identical despite Miller's testimony that his affidavit was given independently and on personal knowledge.

Miller went on to testify that he saw Hill struggling on the ground before Hill was handcuffed and brought into the major's office. According to Miller, Kilbourne was not in the major's office.

Bendtly said that he observed Hill struggle and that he did not see anyone punch or kick Hill. Further, according to Bendtly, Kilbourne was not in the major's office. Finally, Bendtly said Hill was chewing on something during the struggle to handcuff him and that Hill was jumping and pulling away, though these facts were omitted from his earlier affidavit.

### 6. Percy Babin's tetimony

Percy Babin testified that, when he arrived on the scene, Kilbourne was getting ready to handcuff Hill, and Hill was chewing on something. Kilbourne never went into the major's office. Afterward, Babin gave the order for Hill to go to the infir-

mary, but he did not see Hill there. Further, Kilbourne filed a workers' compensation claim for the incident, though he was not injured.

### 7. Dr. Cleveland and Dr. Coullard's testimony

Dr. Cleveland interpreted some of the medical records. Cleveland found no evidence in any of the records that Hill was taken to the infirmary on September 2, 2011. But the records do indicate that, when Hill was examined on September 3, 2011, there were no positive findings of wide spread bruising, lacerations, abrasions, or swelling. Cleveland could not, however, testify as to how this assessment was conducted. Further, Cleveland testified that, on September 7, 2011, Hill had blurred vision in his left eye consistent with documented findings of mild traumatic iritis.

Optometrist Dr. Coullard stated that he treated Hill on September 14, 2011, and that he observed an inflammation in the anterior chamber of the eye, which is consistent with a diagnosis of mild traumatic iritis to his left eye. Coullard prescribed an anti-inflammatory steroid and another medication used to dilate the pupil. Both medications were to be taken for two weeks.

### 8. David Cooper's testimony

David Cooper was an inmate at Dixon who testified that, on September 2, 2011, he ran out of his dormitory and saw that the officers (including Kilbourne and Babin) had Hill pinned to the ground. Cooper said that Kilbourne had his foot or knee in Hill's back and that Hill was not resisting. Babin was trying to help with the handcuffing. According to Cooper, they roughed Hill up, and both Kilbourne and Babin threw a few punches. Cooper also saw the officers pull Hill up by the arms after the handcuffing and heard Hill scream that his arm was hurting. Cooper

said that he tried to go to the bullpen and to the major's office, but the officers would not let any inmates in.

### 9. Tyrone Kilbourne's testimony

Kilbourne testified that officers file workers' compensation claims if they are injured, Kilbourne was not injured, but someone completed one on his behalf. He thought the supervisor requires it whenever there is an accident, but he was not sure. Kilbourne claimed to have no knowledge of the claim until the time of this trial.

Plaintiff demonstrated that, in Kilbourne's discovery responses, he said there were no allegations of excessive force pending against him other than this matter. However, Plaintiff brought forward several ARPs that were filed against Kilbourne for the limited purpose of impeachment evidence. Kilbourne explained that he thought the question was referring to claims pending against him in the judicial system and that he thought an ARP is a request for an administrative remedy.

Concerning the incident, Kilbourne testified that he was making routine rounds on the yard when he noticed that Hill had an object in his left hand which appeared to be a rolled cigarette. Kilbourne said he stopped Hill and said, "Hey, let me pat you down," after which time Hill immediately took his hand and put something in his mouth. When Kilbourne grabbed Hill, Hill pushed away from him, and they slipped and rolled down a hill.

Kilbourne radioed for backup. Hill rolled on top of Kilbourne, and vice versa. According to Kilbourne, Hill was hollering, cursing at him, and chewing something. When three other officers came, they were able to gain control of him; according to Kilbourne, Hill was bigger than he was at the time of trial and had lost weight. Bendtly handcuffed Hill, and they took him to the bullpen. Kilbourne then went to the infirmary.

Kilbourne called Hill combative and disobedient, and Kilbourne said he used the force necessary to gain control of the situation in compliance with the rules. In the brief moment Kilbourne was in the bullpen, nothing happened to Hill. Kilbourne said he did not punch, hit, choke, or stomp on Hill or put his hand in Hill's mouth. The other officers did not do so either.

Kilbourne testified that he wrote Hill up for defiance and aggravated disobedience but not possession of contraband. Kilbourne admitted that in the inmate conduct report, two of the rule three charges were reversed, but he said that finding must have been an accident and/or a line was drawn through it because they still imposed a sentence.

### 10. Jury verdict

After presentation of the evidence, the jury rendered a verdict in favor of the Plaintiff and against Kilbourne and Babin. (R. Doc. 130). The jury awarded nominal damages to the Plaintiff in the amount of $500.00. The jury also awarded punitive damages to the Plaintiff in the amount of $25,000 against Kilbourne and $15,000 against Babin.

### 11. Defendants' Motion to Alter or Amend Judgment (R. Doc. 134)

In the instant motion, Defendants attack the amount of the damage awards. Defendants claim that $500.00 in nominal damages is excessive. Further, Defendants argue that the punitive damage awards are disproportionate to the facts, including the Defendants' reprehensibility, Plaintiff's injuries, and the penalties for allegedly similar criminal statutes.

### B. Legal Standard

 Federal Rule of Civil Procedure 59(e) provides that a "motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judg-

ment." "A Rule 59(e) motion 'calls into question the correctness of a judgment.'" *Templet v. HydroChem Inc.*, 367 F.3d 473, 478 (5th Cir.2004) (quoting *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002)). The Fifth Circuit has held that a Rule 59(e) motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Templet*, 367 F.3d at 478–79 (citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir.1990)). Instead, Rule 59(e) "serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Templet*, 367 F.3d at 479 (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir.1989)) (alterations omitted). "Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Id.* (citations omitted).

### C. Analysis
#### 1. Nominal damages

■ Defendants cite to *Williams v. Kaufman County*, 352 F.3d 994 (5th Cir. 2003), in support of their argument that the nominal damage award of $500 in this case was excessive. The Defendants claim that $500 is a significant sum and that such an award is inappropriate in a non-commercial suit.

Defendants' reliance on *Williams* is misplaced. In *Williams*, the Fifth Circuit found no error in the district court's decision to award $100 in nominal damages to each plaintiff for the violation of their civil rights. *Id.* at 1014–15. The Fifth Circuit explained that $100 was "certainly not out of line with nominal damages that [the

Fifth Circuit] has awarded in the commercial state law context." *Id.* at 1015. The court then noted that, "[i]n the commercial context, we have awarded $2000 in nominal damages and cited as guidance state courts that have awarded between $500 and $5000 in nominal damages for commercial disputes." *Id.* at 1015 n. 70 (citing *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1491 (5th Cir.1990)). The appellate court held that $100 was "an insignificant sum" and affirmed the trial court's decision. *Id.* at 1015.

Thus, contrary to the Defendants' reasoning, *Williams* did not hold that $100 was the maximum recoverable for nominal damages in § 1983 cases. Rather, the Court simply held that $100 was so insignificant as to qualify as nominal damages. In fact, the Court specifically noted that, in commercial disputes, the Court has awarded more than $500. Defendants have provided no good reason why a different standard should apply for § 1983 claims, where an individual's constitutional rights have been violated. Nor have they cited to case law supporting this position.[2]

Unfortunately, $500 remains a trifling sum or inconsequential sum in today's market. Accordingly, the jury was not manifestly erroneous in its nominal damage award.

#### 2. Punitive damages
##### a. Jury's discretion to award punitive damages

Defendants imply throughout their brief that punitive damages are not appropriate in this case. They state that such damages should be awarded in § 1983 actions

---

**2.** Defendants quote *Williams*, which stated, "In *Carey v. Piphus*, [435 U.S. 247, 266–267, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)], the Supreme Court recognized the ability of courts to award 'a nominal sum of money' when a violation of one's rights does not result in actual injury, and awarded nominal

damages of one dollar." 352 F.3d at 1014–15. Given *Williams'* award of over one dollar in nominal damages to plaintiffs in a civil rights action, it seems clear that one dollar is not the limit for nominal damages in such suits in the Fifth Circuit.

"only when [a] defendant's conduct is motivated by evil intent or demonstrates reckless or callous indifference to a person's constitutional rights." (Doc. 134–1, p.3–4) (citations omitted).[3]

To the extent the Defendants make such an argument, the Court rejects them. In *Cooper v. Morales*, 535 Fed.Appx. 425, 432 (5th Cir.2013) (per curiam) (unpublished), the Fifth Circuit explained:

> when a jury finds constitutionally excessive force in violation of the Eighth Amendment, it makes "the threshold finding of 'evil intent' or 'callous indifference' needed to warrant punitive damages, because the threshold standard for excessive-force liability—that the force was applied 'maliciously and sadistically for the very purpose of causing harm'— is substantially indistinguishable from the threshold standard for punitive damages." *Jones v. Conner*, 233 F.3d 574, at *1 (5th Cir.2000) (per curiam) (unpublished disposition) (citing *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)).

Here, the jury found the Defendants liable for using excessive force, and, as detailed above, that finding was not clearly erroneous, much less manifestly in error. Accordingly, the jury had discretion to award punitive damages, and the Court will only focus here on the amount of such damages.

### b. Analysis of amount of punitive damage and summary of conclusions

The heart of Defendants' argument is that the punitive damages awards in this case—$25,000 against Kilbourne and $15,000 against Babin—were excessive. "To determine whether punitive damages are excessive, the Supreme Court requires consideration of three factors (1) the degree of reprehensibility of the defendant's conduct, which receives the heaviest weight; (2) the disparity between the harm suffered (compensatory damages) and the punitive damages awarded; and (3) the possible criminal and civil sanctions for comparable misconduct." *Williams*, 352 F.3d at 1016 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 580, 583, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).

In sum, the Court finds that the punitive damage awards in this case were not excessive. While there are some mitigating factors in this case, the Court concludes that the Defendants' conduct was reprehensible, so this—the most important factor—weighs in favor of the Plaintiff.

The second factor is neutral. The Fifth Circuit has recognized that this factor cannot be effectively applied when only nominal damages are awarded. Rather, the Court evaluates the award under a general reasonableness analysis. Under this standard, and under the facts in the record, the award was reasonable.

The third factor weighs in favor of the Defendants; the relevant criminal penalties are substantially lower than the punitive damage award here. However, this factor is not as important as the first *Gore* factor. Further, the Fifth Circuit has implied that this factor is less probative when the penalty at issue is criminal rather than civil.

Thus, the most important factor weighs in support of the verdict, the lesser important factor weighs against it, and the remaining one is neutral. On this basis, the Court finds no error in the punitive damage awards.

---

**3.** Specifically, Defendants argue a number of times that they "were simply doing their duty as Correction Officers." (Doc. 134–1, pp. 5–6). Furthermore, Defendants assert "[t]he [p]unitive damages did not show that [they] acted wantonly and willfully or [were] motivated by ill will or desire to injure." (Doc. 134–1, p. 10).

But even assuming that the *Gore* factors were neutral, the Court would still find no error in the jury award. In such a situation, the Court is required to look at other cases involving similar facts. While the jurisprudence is limited in this area, the Fifth Circuit case law reflects that the Defendants have simply not met their burden of proving a new trial is warranted, much less the higher burden of altering or amending the judgment, as they request. Accordingly, the Court will also not disturb the jury award on this basis as well, and the Defendants' motion is denied.

### i. Preliminary note.

The Court states at the onset that the Defendants err in arguing that the award should be analyzed as a $40,000 damage award rather than two distinct awards of $25,000 and $15,000. In *Williams,* the Fifth Circuit analyzed the punitive damages awarded under the framework of "$15,000 per plaintiff" and found these awards reasonable. 352 F.3d at 1015–16. The *Williams* court did not combine all three plaintiffs' awards into one sum of $45,000 and then assess the award. *See id.* Thus, this Court will analyze each punitive damage award individually.

### ii. Degree of reprehensibility of Defendants' conduct

█ "The first *Gore* factor ... is 'the most important indicium of the reasonableness of a punitive damages award.'" *Cooper,* 535 Fed.Appx. at 432 (quoting *Gore,* 517 U.S. at 575, 116 S.Ct. 1589). In *Cooper,* the Fifth Circuit has further explained:

> To determine the degree to which conduct is reprehensible, the Supreme Court has instructed [the Court] to consider whether (1) the harm was physical or merely economic, (2) the conduct

evinced a reckless disregard of the health or safety of others, (3) the target was vulnerable, (4) the conduct involved repeated actions or was an isolated incident, and (5) the harm was the result of intentional malice, trickery, or deceit. *State Farm,* 538 U.S. at 419, 123 S.Ct. 1513 (2003).

*Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 417–29, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)).

█ Defendants claim that there conduct was not reprehensible. They were, according to Defendants, "simply doing their duty as Correctional Officers." (Doc. 134–1, p. 5). Defendants refer to Kilbourne's testimony that he had reasonable suspicion to search Hill, the medical evidence indicating that Hill was uninjured, and the alleged absence of evidence of trickery, malice, or deceit and vulnerability of Hill.

The Court finds that, as in *Cooper,* four of the above five factors weigh in favor of the Plaintiff. Here, the harm was physical, not economic. The jury was not clearly in error, much less manifestly erroneous, in concluding that Hill was exposed to excessive forth either when the officers threw a few punches during the handcuffing of Hill, when they beat him in the office, and/or both. Although the jury awarded no compensatory damages, common sense clearly shows that the harm here was physical.[4]

The second factor also weighs in favor of the Plaintiff; Defendants' conduct evinced a reckless disregard for Hill's health and safety. In finding that the Defendants applied excessive force, they necessarily found that they applied force maliciously and sadistically to cause harm. *See Coo-*

---

4. It should be noted that the Defendants admit that there was evidence in the medical records of "mild traumatic iritis" twelve days after the incident. (Doc. 11–778). This is further evidence that the harm was physical, even though compensatory damages were not awarded.

*per*, 535 Fed.Appx. at 432. This conclusion is supported by the events described above—both officers recklessly disregarded Hill's safety when they beat him in the office, and Kilbourne especially did so by instigating the incident, by radioing other officers to join him when Hill was not resisting, and by throwing the first and last punch. The fact that the officers stopped when Hill said he was a diabetic does not erase the disregard for his safety inherent in beating Hill in the first place.

Moreover, the Plaintiff also has the third factor in his favor. As in *Cooper*, the Plaintiff was a "vulnerable victim" because he was a "prisoner in [the Defendants'] custody." *Id.* Further, during a good portion of the beating, Hill's hands were cuffed behind him.

Finally, concerning the fifth factor, it is clear that the harm here—the constitutional violation—was the result of intentional malice on the Defendants' part. Babin behaved maliciously by punching Hill, and Kilbourne behaved particularly maliciously by initiating the incident and by writing up false disciplinary charges against Hill, presumably in an attempt to hide his wrongdoing.

■ But *Cooper* shows that this does not end the inquiry. There, the Fifth Circuit explained that "aggravating factors" must be weighed against "mitigating factors," including whether the incident was isolated or repeated, how long the incident lasted, whether the plaintiff "had some role in precipitating it." *Id.* at 433 (citing *Payne v. Jones*, 711 F.3d 85, 101 (2d Cir. 2013)). The *Cooper* court also noted the severity of the injury as a mitigating factor. *Id.* at 434. Significantly, in *Cooper*, the Court found that the first *Gore* factor

was inconclusive because of these mitigating factors, even though four of the five factors from *State Farm* were implicated.

The Court finds that *Cooper*, a non-binding *per curiam* decision (see 5th Cir. R. 47.5.4) distinguishable on this point and that the Defendants' conduct was still reprehensible in this case. *Cooper* involved an incident that was isolated, brief in duration, and caused in part by the plaintiff. *Id.* at 433. In fact, the only wrong that the *Cooper* court found the officer committed was slamming the inmate to the floor and kneeing him. *Id.* at 430–31.

Here, while there is no evidence of habit in the record [5] and the injuries were minor, the jury clearly accepted the Plaintiff's version of events with respect to culpability: Hill did not break any rules or otherwise provoke the incident; did not resist the officers as they shackled and punched him for no reason; was taken into a room without cameras, where the constitutional violation would not be recorded; was beaten by Kilbourne and Babin; and then written up and punished for violations he did not commit. This finding is supported by the evidence and is not clearly in error, much less the higher burden of being manifestly erroneous. Further, the record is unclear as to the duration of the incident, but Hill specifically testified that the officers only stopped because Hill told them he was diabetic and could be seriously injured. Thus, to the extent the beating was limited in duration, it was only because of the pleas of the plaintiff and the officers fear of being caught by causing serious injuries.

With only two mitigating factors in the Defendants' favor, and with such strong

---

5. Plaintiff proffered evidence on this issue, but the Court found that the only witness offered by the Plaintiff for this fact lacked the necessary first-hand knowledge. Thus, the Court prohibited the testimony. Further, while the Plaintiff introduced evidence of other ARPs filed against Kilbourne alleging excessive force, the Court introduced these for the limited purpose of impeachment and instructed the jury accordingly.

evidence demonstrating the egregiousness of the Defendants' conduct here, the Court finds that the first and most important *Gore* factor supports the award of punitive damages. The Court then turns to the next factor.

### iii. The relationship between the harm and the punitive damage awards

Defendants argue that the second *Gore* factor weighs in their favor. Defendants concede that the ratio analysis cannot be effectively applied in cases like this one where only nominal and punitive damages were awarded, not compensatory damages. (Doc. 134–1, p. 7). Defendants then add the $25,000 and $15,000 punitive damage awards together and argue that the "award in this case is [a] disproportionate . . . ratio of 40– to- zero." (Doc. 134–1, p. 8). Defendants argue that "[s]uch . . . extreme ratios should be presumptively invalid." (*Id.*).

In short, the Court rejects these arguments and finds that the second factor is inconclusive here. In *Williams,* the Fifth Circuit explained the difficulty of applying the second *Gore* factor in cases where only nominal damages have been awarded:

> [A]ny punitive damages-to-*compensatory* damages "ratio analysis" cannot be applied effectively in cases where only *nominal* damages have been awarded, such as the § 1983 suit before us. The Supreme Court has counseled that this factor does not impose a mathematical formula for constitutional proportionality, but instead only embodies "a general concern of reasonableness." [ *Gore,* 517 U.S. at 582–83, 116 S.Ct. 1589]. Because actions seeking vindication of constitutional rights are more likely to result only in nominal damages, strict proportionality would defeat the ability to award punitive damages at all.

*Williams,* 352 F.3d at 1016. Similarly, in *Cooper,* the Fifth Circuit echoed these principles:

> The probative value of the second *Gore* factor . . . depends upon the character of the underlying injury and amount of the compensatory damages award. "When compensatory damages are substantial" and the monetary value of the harm is easily calculated, "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *State Farm,* 538 U.S. at 425–26, 123 S.Ct. 1513. By contrast, "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Gore,* 517 U.S. at 582, 116 S.Ct. 1589; *see also Williams v. Kaufman Cnty.,* 352 F.3d 994, 1016 (5th Cir.2003) ("Because actions seeking vindication of constitutional rights are more likely to result only in nominal damages, strict proportionality would defeat the ability to award punitive damages at all."); *Lee v. Edwards,* 101 F.3d 805, 811 (2d Cir. 1996) ("In *Gore,* a 500 to 1 ratio was 'breathtaking.' However, in a § 1983 case in which the compensatory damages are nominal, a much higher ratio can be contemplated while maintaining normal respiration.").

*Cooper,* 535 Fed.Appx. at 433.

Based on this direction from the Fifth Circuit, the Court finds this factor inconclusive. Further, based on the analysis throughout this opinion, the Court finds that the awards do not violate any "general concern of reasonableness." The Court will then turn to the final factor.

### iv. Possible criminal and civil sanctions for comparable conduct

Concerning the third *Gore* factor, the Fifth Circuit has explained, "If a state punishes comparable misconduct with mi-

nor civil penalties, then a much larger punitive damages award may be constitutionally excessive." *Cooper*, 535 Fed. Appx. at 433 (citing *Gore*, 517 U.S. at 583–85, 116 S.Ct. 1589). "If, on the other hand, the punitive damages award is commensurate with civil and criminal sanctions for comparable misconduct, it is more likely to fall within constitutional limits." *Id.* (citing *Kunz v. DeFelice*, 538 F.3d 667, 679–80 (7th Cir.2008)).

■ Here, Defendants argue that "comparable criminal and civil sanctions … [are] easily applicable to this type of constitutional violation, because there is readily identifiable law imposing civil or criminal penalties on law enforcement officers/Corrections Officers for such violations." (Doc. 134–1, p. 9). Defendants cite to criminal statutes in support of their argument. First, La.Rev.Stat. § 14:35, entitled "Simple battery," provides:

> A. Simple battery is a battery committed without the consent of the victim.
> B. Whoever commits a simple battery shall be fined not more than one thousand dollars or imprisoned for not more than six months, or both.

La.Rev.Stat. Ann. 14:38, entitled "Simple Assault," provides:

> A. Simple assault is an assault committed without a dangerous weapon.
> B. Whoever commits a simple assault shall be fined not more than two hundred dollars, or imprisoned for not more than ninety days, or both.

La.Rev.Stat. § 36 defines assault as "Assault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." Defendants argue that these two statutes show that the award in this case "is [a] much larger punitive damage award" that is excessive of the criminal fine. (Doc. 134–1, p. 9).

Defendants are correct that, in this case, the punitive damage award is substantially higher than comparable criminal conduct. Thus, this *Gore* factor weighs in their favor.

However, the Fifth Circuit has stated that this *Gore* factor is less probative when there is no comparable civil penalty. In *Cooper*, the punitive damage award was $3,500 while the comparable Texas criminal law (assault with the intent to cause bodily injury to another) was a "Class A misdemeanor punishable by a criminal fine of up to $4,000 and up to one year of imprisonment." 535 Fed.Appx. at 433–34 (citing Tex. Penal Code §§ 22.01(a)(1), 12.21). The fifth Circuit found that, while this similarity between the criminal sanctions and punitive damage award was relevant, it was less probative because it was not a civil fine:

> Although this sanction is commensurate with the $3,500 punitive damages award—a relevant consideration—the equivalence is less probative than it otherwise would be because it is criminal, not civil, in nature. *Compare Abner v. Kansas City S. R.R. Co.*, 513 F.3d 154, 164 (5th Cir.2008) (finding dispositive that the punitive damages award fell within a civil statutory punitive damages cap), *with State Farm*, 538 U.S. at 428, 123 S.Ct. 1513 (explaining that although "the existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action," it is of "less utility" in determining the dollar amount of the award), *and Payne*, 711 F.3d at 103 ("The fact that New York classes [the defendant]'s conduct as warranting criminal prosecution tends to confirm the appropriateness of the imposition of a punitive award. However, it tells little about the appropriateness of the amount of the award.").

*Cooper*, 535 Fed.Appx. at 433–34. Accordingly, while this *Gore* factor favors the Defendants, it is less important than the

reprehensibility factor and less probative because it is not a civil sanction.

### v. Summary of *Gore* analysis and other relevant case law

In sum, the *Gore* factors here weigh in favor of supporting the punitive damage award. The first and most important factor—reprehensibility—weighs in the Plaintiff's favor. The second is neutral. The third factor is on the Defendants' side, but it is less important than the first and less probative than it otherwise could be.

Accordingly, based on these factors and the evidence in the record, the Court finds that the damage awards of $25,000 and $15,000 were reasonable. This finding is not clearly contrary to the evidence, much less manifestly erroneous.

Nevertheless, the Fifth and Second circuits have examined other punitive damage awards when evaluating excessiveness. *See Williams*, 352 F.3d at 1016 n. 78; *Cooper*, 535 Fed.Appx. at 434 ("With the *Gore* factors in equipoise, we look to punitive damages rulings in factually similar cases."); *Payne*, 711 F.3d at 104 ("Courts have often found it helpful in deciding whether a particular punitive award is excessive to compare it to court rulings on the same question in other cases."). Therefore, the Court will engage in this analysis. In doing so, the Court finds that the case law supports the award of damages here.

In *Cooper*, the Fifth Circuit noted that there are "relatively few other cases addressing the amount of punitive damages awarded in the context of civil rights actions." 535 Fed.Appx. at 434 (quoting *Williams*, 352 F.3d at 1016 n. 78). Citing to this, and noting "the still-smaller subset of excessive force cases," the Fifth Circuit found "instructive" the Second Circuit's *Payne* decision, a case involving a punitive damage award. The Fifth Circuit described the case:

The underlying assault in *Payne*, which the court found "reprehensible" but not to an unusually high degree, had aggravating and mitigating factors: on the one hand, the officer verbally provoked the attack by taunting the arrestee, the arrestee was mentally ill, and the officer had a history of excessive force violations; on the other hand, the attack "lasted at most 30 seconds, did not involve use of a weapon, and did not cause any serious physical injuries." 711 F.3d at 101. The second and third *Gore* factors, the court determined, were also inconclusive. *Id.* at 102–04. The court then conducted an exhaustive survey of punitive damages awards in excessive-force cases, noting that it had upheld awards as high as $175,000 and remitted awards as low as $75,000 under similar circumstances. *Id.* at 104–06. Using precedent and the *Gore* factors as guideposts, the court concluded that "the highest level of punitive damages that can properly be sustained [under the circumstances] is $100,000." *Id.* at 106.

*Id.* at 434. If $100,000 was permissible in *Payne*, where the *Gore* factors were inconclusive, and where there was also no serious injury, then the awards here are also permissible, where they tilt in favor of the Plaintiff.

The fact that compensatory damages were $60,000 in *Payne*, 711 F.3d at 103, and $0 in this case does not alter the Court's analysis. This is only one factor in the extensive analysis performed by the *Payne* court More importantly, the punitive damage awards in this case are substantially less than $ 100,000. Thus, to the extent *Payne* is a more severe case than the present one by virtue of the compensatory damages, that fact is accounted for in the significantly reduced awards in this case.

The *Cooper* court also found *Williams* instructive. In *Williams*, after a bench

trial, the district court found that an officer conducted unconstitutional strip searches in violation of the Fourth Amendment. 352 F.3d at 1001. The court awarded no compensatory damages, $100 in nominal damages, and $15,000 in punitive damages to each plaintiff. *Id.* The Fifth Circuit affirmed the punitive damage award. *Id.* at 1016. Concerning the *Gore* factors, the Fifth Circuit found a high degree of reprehensibility "because [the defendant] perpetrated extremely invasive searches on innocent individuals without specific probable cause or reasonable suspicion, in contravention of the warrant itself and clear precedent." *Id.* The court also found a "reasonableness" requirement for the second factor, *Id.* and the inapplicability of the third factor given the absence of any relevant civil or criminal penalties. *Id.* at 1016 n. 77.

*Williams* is important here for two reasons. First, it demonstrates that awards of $15,000 in a § 1983 case involving nominal damages were not unreasonably high. This is particularly relevant as the decision was rendered twelve years ago; thus, a higher award now seems permissible. Second, it refutes one of Defendants' arguments—that other case law demonstrates that this award is excessive.

The Defendants cite to two out-of-circuit cases in support of their argument. Defendants first cite to *Provost v. City of Newburgh*, 262 F.3d 146 (2d Cir.2001). There, the jury awarded nominal damages and $10,000 dollars in punitive damages against each unlawful defendant. *Id.* at 153. The Second Circuit concluded this punitive damage award "approaches the limits of what [the Second Circuit] would deem consistent with constitutional constraints." *Id.* at 164. Defendants then cite to *McKinley v. Trattles*, 732 F.2d 1320, 1327–28 (7th Cir.1984), a case involving the illegal strip search of a prisoner. There the Seventh Circuit reduced a puni-

tive damage award from $15,000 to $6,000. *Id.* Based on these cases, Defendants argue that the Court should alter or amend the judgment in this case to prevent "imposing a 'grossly excessive' punishment on the [D]efendants." (Doc. 134–1, p. 8).

The Fifth Circuit, however, expressly declined to extend these cases in *Williams.* After reviewing *Provost, McKinley,* and another state case, the Fifth Circuit explained:

> Although $15,000 may be slightly higher in this case than in cases decided by other circuits, two factors convince us that the amount is nonetheless reasonable: (1) our review of the evidence before the district court regarding the type of conduct that occurred, and (2) our necessarily unscientific balancing of the factors laid out in *Gore.*

*Williams,* 352 F.3d at 1016 n. 78.

The same reasoning applies here. While awards of $15,000 and $25,000 may seem high, the awards are not unreasonably so based on the evidence in the record, the Defendants' conduct, and the Court's "necessarily unscientific balancing" of the *Gore* factors.

The Court again notes that the *Cooper* decision is not binding and distinguishable on the quantum issue. *Cooper* affirmed an award of punitive damages of $3,500 in punitive damages and $30.00 in compensatory damages to an inmate when a prison official slammed him to the ground and kneed him. As amply demonstrated above, the Defendants conduct in this case is substantially more reprehensible.

Other Fifth Circuit cases provide little guidance. They do, however, show that awards of $25,000 and $15,000 are far below the maximum of punitive damages awarded.

*Bedford v. City of Mandeville* involved excessive force in effectuating an arrest.

The Plaintiff alleged he was "struck in the forehead by [a] Mandeville Police Officer ... with a canister of pepper spray ... and subsequently battered and assaulted by ... members of the Mandeville police department and St. Tammany Parish Sheriff's office." *Bedford v. City of Mandeville.*, No. 96–0737, 1997 WL 543103, at *1 (E.D.La. Sept. 4, 1997), *rev'd in part*, 226 F.3d 642, 2000 WL 1029072 (5th Cir.2000) (unpublished table decision). The jury awarded $32,000 in compensatory damages and $50,000 in punitive damages. *Id.*, 226 F.3d 642, 2000 WL 1029072, at * 1. The district court granted the defendant's JML motion and vacated the punitive damage award. *Id.* The Fifth Circuit reversed and restored the award. *Id.* at *2. Without providing any description of the testimony given at trial, the Fifth Circuit merely said that an independent witness corroborated the plaintiff's testimony that the defendant "initiated the violence and used grossly excessive force." *Id.* The Court did not articulate an analysis of the excessiveness of the award.

In *Lewis v. Pugh*, 289 Fed.Appx. 767, 777 (5th Cir.2008), the Fifth Circuit affirmed an award of $250,000 where an officer "utilize[ed] a position of trust to rape and assault a vulnerable woman." The Court stated that the conduct was "particularly reprehensible." *Id.* Further, the compensatory damages were $50,000, so the pertinent ratio was only 5:1. *Id.* Finally, the criminal sanctions for rape were severe. *Id. Lewis* is clearly distinguishable given the extraordinarily reprehensible conduct in that case and the compensatory damages awarded.

In sum, the Defendants have simply failed to sustain their burden of showing that the jury's award "furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Cooper*, 535 Fed. Appx. at 435 (quoting *State Farm*, 538 U.S. at 417, 123 S.Ct. at 1513). The

wrongdoers will be punished, and other prison officials will be deterred. The jury's finding was not unsupported by the evidence, much less manifestly erroneous.

**D. Conclusion**

Accordingly,

**IT IS ORDERED** that the Defendants' Motion to Alter or Amend Judgment (R. Doc. 134) is **DENIED.**